Carmen RIVERA, on behalf of herself and her minor child, Plaintiffs,

v.

The READING HOUSING AUTHORITY and Daniel F. Luckey, in his official capacity as Executive Director of the Reading Housing Authority, Defendants.

No. 91–CV–7899.

United States District Court, E.D. Pennsylvania.

Jan. 25, 1993.

---

Peter Zurflieh, Harrisburg, PA, for plaintiff.

Edwin L. Stock, Reading, PA, for defendants.

### OPINION AND ORDER

VAN ANTWERPEN, District Judge.

### I.  INTRODUCTION

On December 23, 1991, plaintiffs filed this action challenging a policy of the Reading Housing Authority ("RHA") that requires applicants for public housing under the age of eighteen (18) to provide a judicial decree of emancipation as a condition of admission. Plaintiff's Motion for Summary Judgment and Defendants' Cross–Motion for Summary Judgment or, in the alternative, Motion to Dismiss, are now before the court.

Plaintiff challenges RHA's policy of requiring a judicial decree on three grounds [1]: (A) as contravening the purpose of the U.S. Housing Act of 1937;  (B) as violating the

U.S. Department of Housing and Urban Development ("HUD") regulations prohibiting categorical limitations in tenant selection criteria (24 C.F.R. §§ 960.204(c)(1), 960.205(a)); and (C) as violating the Due Process clause of the Fourteenth Amendment because it creates an irrebuttable presumption.  Plaintiff seeks injunctive and monetary relief for these violations under 42 U.S.C. § 1983. Our jurisdiction is based upon 28 U.S.C. § 1331.

After reviewing the statutory scheme, the regulations and the administrative guidelines developed by HUD, we determine that RHA's judicial decree requirement for minor applicants does not violate the U.S. Housing Act of 1937, its implementing regulations or the Due Process clause of the Fourteenth Amendment and, hence, we grant defendants' Motion for Summary Judgment.

### II.  SUMMARY JUDGMENT STANDARD

The court shall render summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed.R.Civ.P. 56(c).  An issue is "genuine" only if there is a sufficient evidentiary basis on which a reasonable jury could find for the non-moving party.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986).  A factual dispute is "material" only if it might affect the outcome of the suit under governing law.  *Id.* at 248, 106 S.Ct. at 2510.  All inferences must be drawn and all doubts resolved in favor of the non-moving party.  *United States v. Diebold, Inc.*, 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962);  *Gans v. Mundy*, 762 F.2d 338, 341 (3d Cir.), *cert. denied*, 474 U.S. 1010, 106 S.Ct. 537, 88 L.Ed.2d 467 (1985).

On motion for summary judgment, the moving party bears the initial burden of identifying for the court those portions of the record that it believes demonstrate the ab-

---

**1.** Plaintiff has elected not to pursue her claim under the federal Age Discrimination Act.  42   U.S.C. §§ 6101 *et seq.* (1986).

sence of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986). To defeat summary judgment, the non-moving party must respond with facts of record that contradict the facts identified by the movant and may not rest on mere denials. *Id.* at 321 n. 3, 106 S.Ct. at 2552 n. 3 (quoting Fed.R.Civ.P. 56(e)); *see First Nat'l Bank of Pennsylvania v. Lincoln Nat'l Life Ins. Co.,* 824 F.2d 277, 282 (3d Cir.1987). The non-moving party must demonstrate the existence of evidence that would support a jury finding in its favor. *See Anderson,* 477 U.S. at 248–49, 106 S.Ct. at 2510–11.

### III. *BACKGROUND*

### A. PROCEDURAL BACKGROUND

The complaint was filed in this action on December 23, 1991 by three named plaintiffs on behalf of themselves and a proposed class, seeking declaratory and injunctive relief. On April 3, 1992, plaintiffs filed a *motion for* class certification. We denied that motion by order dated April 27, 1992 with an accompanying memorandum. Plaintiffs' counsel thereafter filed stipulations for voluntary dismissal, without prejudice, of the claims of two of the three original named plaintiffs because their whereabouts were unknown.[2] Plaintiff seeks declaratory and injunctive relief requiring the RHA to change its policy of requiring minor applicants for public housing to provide a judicial decree of emancipation before being considered eligible for public housing, and to provide public housing and monetary compensation to plaintiff, who was denied admission to public housing as a result of her failure to seek an emancipation decree under this requirement.

Following the completion of discovery, the parties determined that the facts necessary to resolve plaintiff Rivera's claims were not in dispute, and the parties agreed to submit this action to the court on cross-motions for summary judgment.

2. Only the claims of plaintiff Carmen Rivera remain in this action.

3. The revised policy provides:

### B. FACTUAL BACKGROUND

The undisputed and stipulated facts necessary to determine plaintiff's claims for declaratory and injunctive relief are as follows.

Defendant RHA is a Pennsylvania public housing authority created in or around 1939 pursuant to Pennsylvania's Housing Authorities Law. 35 Pa.Cons.Stat.Ann. §§ 1541 *et seq.* (1977). Through annual contributions contracts with the Secretary of HUD, RHA is authorized to engage or assist in the development, administration or operation of low income housing on a local level, in accordance with the United States Housing Act of 1937, as amended. 42 U.S.C. § 1437 *et seq.* RHA operates eight low income housing projects and also assists lower income individuals in obtaining affordable housing with private landlords through the Section 8 program of the Housing Act.

The annual contributions contract between the Secretary of HUD and RHA requires RHA to follow the regulations promulgated by HUD under the U.S. Housing Act of 1937 and also to comply with terms of the HUD Public Housing Occupancy Handbook ("Handbook"). In accordance with public housing regulations contained in the Code of Federal Regulations and the directives issued by HUD in its Handbook, RHA developed a tenant "Admissions and Occupancy Policy", which governs eligibility for admission to low-income housing projects owned and operated by RHA.

In March, 1991, RHA revised its Admissions and Occupancy Policy and submitted it to HUD for review and approval. By letter dated July 2, 1991, HUD approved the revised Admissions Policy without change. The revised policy was also approved by resolution of the RHA Board of Commissioners and became effective on July 23, 1991. The revised RHA policy contains an express requirement that minor applicants (*i.e.,* applicants under eighteen years of age) obtain a judicial decree of emancipation in order to be eligible to rent RHA-administered public housing.[3] RHA has not taken steps beyond

*Emancipated Minor*—An "Emancipated Minor" is a minor under the age of eighteen (18) who has been determined by the judicial sys-

this to establish its own standard or procedure for determining whether a minor applicant is sufficiently able to sign a lease, and abide by its terms.[4]

The RHA's purposes for requiring a judicial decree of emancipation are to: (a) ensure that a lease agreement entered into by the RHA with a minor is enforceable by the RHA; (b) establish that the minor applicant is in need of public housing; and (c) establish the minor's capacity to comply with the terms of a lease and ability to live independently. Stipulation of Facts, ¶ 2. The parties also agree upon the following additional facts.

Plaintiff Carmen Rivera was born in Puerto Rico on January 17, 1975. Her parents are separated, and she lived with and was raised by her paternal grandparents, Louis Rivera and Ramonita Perez.

Ms. Rivera's father has mental health problems and has been in and out of prison and mental institutions throughout her life. Her father lived with Ms. Rivera and her grandparents in Puerto Rico between institutionalizations. Ms. Rivera's father was incarcerated for about a year at the Pennsylvania State Correctional Institution in Camp Hill and was then transferred to a mental hospital, where he presently resides. Ms. Rivera lived with her mother only for a few months following her birth and has seen her mother only two or three times since then. She last saw her mother about five years ago. The last Ms. Rivera heard about her mother was that she was incarcerated in Florida.

Ms. Rivera attended kindergarten through ninth grade in Puerto Rico. She moved from Puerto Rico with her grandparents to Allentown, Pennsylvania when she was fifteen years old. Ms. Rivera lived with her grandparents in Allentown for about five months. She met David Gonzalez, who is presently twenty-three years old, when she was fifteen and decided to live with him about three months after they met. Ms. Rivera and Mr. Gonzalez lived together for about one year in an apartment in Allentown.

In February, 1991, Ms. Rivera and Mr. Gonzales moved along with Ms. Rivera's grandparents to Reading, Pennsylvania. Ms. Rivera and Mr. Gonzalez lived with Ms. Rivera's grandparents in a two bedroom apartment at 722 North Second Street in Reading. While living with her grandparents on Second Street, Ms. Rivera's clothes and living expenses were paid for by her grandfather, who also paid Mr. Gonzalez' living expenses. Neither Ms. Rivera nor Mr. Gonzalez contributed to the household. About a month after moving to Reading, Ms. Rivera's great-aunt arrived from Puerto Rico to live with them.

In April, 1991, Ms. Rivera and Mr. Gonzalez moved out of the apartment at 722 North Second Street. Ms. Rivera was pregnant with her first child at that time, and she and Mr. Gonzalez wanted some privacy and a place of their own. Before leaving her grandparents' apartment, Ms. Rivera and Mr. Gonzalez applied for public assistance. They were found eligible for a cash assistance grant in the amount of $316 per month.

Ms. Rivera and Mr. Gonzalez moved from her grandparents' apartment into their own one-bedroom apartment at 637 North Ninth Street in Reading. Ms. Rivera and Mr. Gonzalez entered into a written lease under which they were required to pay $260 per month in rent for the apartment, plus utilities. The apartment was clean but crowded and there were mice. In June, 1991, Mr.

---

tem to be an emancipated minor by judicial decree.
No housing unit under the jurisdiction of the Authority shall be rented to any applicant who has not attained the age of eighteen (18) years, unless said applicant has been determined to be an emancipated minor by the courts and is entitled to contract for necessities.

**4.** Prior to March, 1991, RHA reaffirmed the existing written version of its Admissions and Occupancy Policy, which was interpreted by RHA to require a judicial decree of emancipation. The original version provided:

No housing unit under the jurisdiction of the RHA shall be rented to any applicant who has not attained the age of eighteen (18) years, unless said person be determined to be an "emancipated minor" entitled to contract for necessities, or other person, under said age, able to establish that he is legally able to execute for himself and members of his family, to be housed by the RHA, a binding and enforceable contract for necessities.

Gonzalez got a job as a cook at McDonald's. His present biweekly earnings are between $200–$280. Ms. Rivera remained eligible for $205 per month in cash assistance payments. In addition, Ms. Rivera and Mr. Gonzalez receive $143 per month in food stamps. Ms. Rivera also receives medical assistance from Medicaid for herself and her daughter, and both participate in the Women's, Infants' and Children's ("WIC") Nutrition program, 62 Pa.Cons.Stat.Ann. §§ 2951 *et seq.* (1986), which provides cereal, milk and juice for mother and child.

On May 21, 1991, prior to the July effective date of the revised RHA Admissions Policy but after RHA's reaffirmation of its existing written admissions policy, Ms. Rivera and Mr. Gonzalez filed a written application for public housing with the Reading Housing Authority. As is the case with all minor applicants for public housing through the RHA, Ms. Rivera was placed on a waiting list pending the RHA's receipt of a judicial decree of emancipation. On August 9, 1991, Ms. Rivera received a letter from the RHA stating that she would have to obtain a judicial decree of emancipation in order for her and Mr. Gonzalez to be admitted to public housing. Despite the August 9, 1991 letter, Ms. Rivera did not seek or submit an emancipation decree, nor did she contact the RHA concerning her eligibility for housing. Instead, on August 16, 1991, Ms. Rivera's attorney wrote to the RHA on Ms. Rivera's behalf objecting to the RHA's requirement that she obtain a judicial decree of emancipation and explaining that, under Pennsylvania law, minors may enter into enforceable contracts for "necessaries."

Thereafter, on September 9, 1991, the RHA sent Ms. Rivera a Notification of Ineligibility, stating that her application for admission to public housing was denied based upon her failure to comply with the RHA's policy concerning applicants under the age of eighteen years.

On November 24, 1991, Ms. Rivera gave birth to a baby girl, Vanessa Gonzalez. Ms. Rivera understood that their lease agreement for the apartment at 637 North Ninth Street did not permit children. Ms. Rivera, however, got permission from the landlady to stay in the apartment after the baby was born.

Ms. Rivera, Mr. Gonzalez, and their daughter, Vanessa, continued to reside at 637 North Ninth Street until February, 1992, when they moved to a larger one-bedroom apartment in a building, owned by a friend of Ms. Rivera's grandfather, at 142 North Eighth Street in Reading. Ms. Rivera and Mr. Gonzalez have an oral lease agreement for this apartment, under which they are required to pay $400 per month in rent, including utilities.

Although the apartment is in good condition, Ms. Rivera discovered rats in the apartment. She and Mr. Gonzalez notified the landlord of this problem and he gave them rat traps. They have caught two or three rats in the apartment.

Ms. Rivera and Mr. Gonzalez have supported themselves and their daughter on Mr. Gonzalez' earnings from McDonald's and the monthly cash assistance grant, food stamps and medical assistance which Ms. Rivera receives. Ms. Rivera has received only limited help from her grandparents since she and Mr. Gonzalez moved out of their apartment in April, 1991. Periodically, when Ms. Rivera has run short of cash, her grandfather has taken her to the store to buy necessities, such as Pampers and other items for the baby. On each such occasion, she and Mr. Gonzalez repaid Ms. Rivera's grandfather as soon as they were able to do so. Ms. Rivera, who was expecting her second child this past November, sees her grandparents every day.

## IV. *DISCUSSION*

The United States Housing Act of 1937 ("Housing Act"), 42 U.S.C. §§ 1437 *et seq.* was enacted "to assist the several States and their political subdivisions to remedy the unsafe and unsanitary housing conditions and the acute shortage of decent, safe, and sanitary dwellings for families of lower income." 42 U.S.C. § 1437. The Housing Act authorizes the Department of Housing and Urban Development to provide low interest loans, grants and other assistance for the construction and operation of housing for families with low incomes. 42 U.S.C. § 1437b. In

order to accomplish the stated purpose of the Housing Act, Congress specifically recognized the need to vest the maximum amount of power and responsibility with the local public housing authorities in order to promote efficient management of the housing programs. *Vandermark v. Housing Auth. of York,* 663 F.2d 436, 439 (3d Cir.1981). This was expressly stated under the section of the Housing Act captioned "Declaration of Policy," which states, in pertinent part, that:

> [i]t is the policy of the United States ... to vest in local public housing agencies the maximum amount of responsibility in the administration of their housing programs.

42 U.S.C. § 1437.

In addition, the Housing Act encourages the development of sound and efficient management programs and practices to assure rental collection. The Housing Act states, in pertinent part, that:

> [e]very contract for annual contributions shall provide that ... the public housing agency shall comply with such procedures and requirements as the Secretary may prescribe to assure that sound management practices will be followed in the operation of the project, including requirements pertaining to ... the establishment of satisfactory procedures designed to assure the prompt payment and collection of rents....

42 U.S.C. § 1437d(c)(4)(B).

Consistent with the Housing Act's declaration of policy to vest the maximum amount of power and responsibility with the local public housing authorities in order to promote efficient management, HUD, through its regulations directs each public housing authority to:

> adopt and implement policies and procedures embodying standards and criteria for tenant selection which take into consideration the needs of individual families for public housing and the statutory purpose

in developing and operating socially and *financially sound public housing projects.*

24 C.F.R. § 960.204(a). (emphasis added)

■ It is clear then that the purpose of the Housing Act is twofold: (1) to establish a program of federal aid to local agencies engaged in providing decent, safe, and sanitary housing for lower income families, while at the same time (2) vesting maximum responsibility in the administration of housing programs with local public housing authorities. It is also clear that both Congress and HUD are greatly concerned with developing sound and efficient management programs which assure rental collection and fiscal stability. Indeed, both Congress[5] and HUD[6] delegate the establishment of policies and regulations for eligibility and admissions to local public housing authorities in order to effectuate the underlying policy of the Housing Act by promoting efficient management of the programs. *James v. New York Housing Auth.,* 622 F.Supp. 1356, 1361–62 (S.D.N.Y.1985). As such, Congress and HUD have granted limited power to local authorities to make reasonable policy decisions not specifically authorized in the Housing Act. *Vandermark,* 663 F.2d at 439; *James,* 622 F.Supp. at 1362. The discretion of local housing authorities, however, is not unbounded; it must be exercised "consistent with the objectives" of the Housing Act. 42 U.S.C. § 1437; *Hann v. Housing Auth. of Easton,* 709 F.Supp. 605, 608 (E.D.Pa.1989).

■ Therefore, in assessing whether the RHA has violated the Housing Act or HUD regulations, we must keep in mind that the Housing Act gives local housing authorities discretion to select applicants and otherwise to manage the day-to-day affairs of subsidized housing projects. *See* 42 U.S.C. § 1437. We also recognize that the administration of local housing authorities is a difficult task, and the concern for efficient management is particularly important, because

**5.** Under the Housing Act, local housing authorities are required to admit families "in accordance with duly adopted regulations and approved income limits." 42 U.S.C. § 1437d(c)(2).

**6.** 24 C.F.R. § 960.204(a) provides, in relevant part, that:

> In addition to policies and regulations including preferences and priorities *established by the [public housing authority] for eligibility and admission* ... each [public housing authority] shall adopt and implement policies and procedures embodying standards and criteria for tenant selection ... (emphasis added).

the number of applicants greatly exceeds the available housing. *See Gholston v. Housing Auth. of Montgomery,* 818 F.2d 776, 781 (11th Cir.1987). Consequently, the scope of judicial review of a local housing authority's policies and practices is limited, and we will not view its actions as a violation of the Housing Act or HUD regulations so long as the local housing authority's eligibility requirements are "consistent with [HUD] regulations and is in harmony with the overall policies" of the Housing Act. *Vandermark,* 663 F.2d at 440.

## A. HOUSING ACT

■ Plaintiff argues that the RHA's policy of requiring a judicial decree must be seen as violating the Housing Act because it forecloses access to needy applicants under the age of eighteen. This argument attributes to the Housing Act an intention that is not reflected by its words or provisions. The argument depends on the proposition that the Housing Act seeks to make housing available to every potential applicant. However, as is evidenced by the Housing Act and the implementing regulations, which direct local public housing authorities to establish eligibility policies and tenant selection criteria, applicants may be denied admission for a variety of reasons. *See, e.g.,* 24 C.F.R. § 960.205. Often, in order to qualify for public housing, applicants must satisfy a variety of stringent eligibility standards. For example, an applicant must often comport with stringent requirements pertaining to income, assets, rent-paying record as well as standards concerning past criminal or violent behavior. 24 C.F.R. § 960.205; *James,* 622 F.Supp. at 1357. Therefore, plaintiffs argument that RHA's policy violates the Housing Act simply because it may foreclose access to some needy minors, is erroneous. Furthermore, as discussed in Part C. *infra,* RHA's policy is consistent with the Housing Act's policy regarding sound and efficient management programs to assure rental collection.

## B. HUD REGULATIONS

Plaintiff next contends that the exclusion of minor applicants who do not provide a judicial decree of emancipation violates HUD regulations, which provide that local housing authorities shall "[n]ot automatically deny admission to a particular group or category of otherwise eligible applicants (e.g., unwed mothers or families with children born out of wedlock)." 24 C.F.R. § 960.204(c)(1). Plaintiff also contends that the challenged policy violates 24 C.F.R. § 960.205(a) ("The criteria to be established and information to be considered shall be reasonably related to individual attributes and behavior of an applicant and shall not be related to those which may be imputed to a particular group or category of persons of which an applicant may be a member.").

### (1) *The Policy does not violate HUD Regulations.*

■ First, the HUD regulations cited and relied upon by plaintiff are concerned with the admission to a housing authority of "otherwise eligible applicants." Plaintiff's reliance on these regulations is somewhat misplaced since these regulations deal with applicant *admission,* not *eligibility*[7]. Nonetheless, we find that RHA's policy of requiring a judicial decree does not violate the regulation's prohibition on categorical exclusions. Specifically, RHA's minor policy does not "automatically deny" admission to minors. Rather, minors who enjoy emancipated status can, if "otherwise eligible", obtain housing through RHA. Thus, RHA's minor policy does not automatically deny admission to all minors, but only those who fail to obtain a judicial decree of emancipation. Accordingly, RHA's policy does not violate 24 C.F.R. § 960.204(c)(1).

■ Similarly, RHA's minor policy does not violate 24 C.F.R. § 960.205(a).[8] First,

---

7. As the court in *Hann* correctly points out, the line between a landlord's selection of tenants and an applicant's eligibility under the Housing Act was blurred by the court in *James v. New York Housing Auth.,* 622 F.Supp. 1356 (S.D.N.Y.1985). *Hann,* 709 F.Supp. at 609 n. 6.

8. "The criteria to be established and information to be considered shall be reasonably related to individual attributes and behavior of an applicant and shall not be related to those which may be imputed to a particular group or category of persons of which an applicant may be a member." 24 C.F.R. § 960.205(a).

the policy of requiring a judicial decree does not consider an "attribute" (i.e., characteristic or quality) or "behavior" of an applicant. Instead, as discussed more fully in Part (2) *infra*, it merely recognizes hornbook law that a minor can disaffirm a contract.[9] Second, RHA's minor policy does not "impute" attributes or behavior to minors as a group or category. The rationale underlying the minor policy is the recognition that under the law a minor can disaffirm a contract, not that all minors are immature, irresponsible or incapable of managing a household. Thus, RHA's minor policy deals with an applicant's ability to enter into a lease that is legally enforceable by the RHA. RHA's policy, therefore, complies with 24 C.F.R. § 960.-205(a). Also, as discussed below, HUD specifically endorses policies, such as RHA's, which set a minimum age for admission.

### (2) *HUD Regulations Support the Policy.*

HUD publishes a Public Housing Occupancy Handbook to assist local housing authorities in complying with HUD regulations and contribution contracts. *Hess v. Ward*, 497 F.Supp. 786, 798 (E.D.Pa.1980). In § 4–2 of the Handbook dealing with Admissions, HUD provides, in relevant part, that:

a. *POLICY*

. . . .

(2) The [public housing authority] may set a minimum age for admission to avoid entering into leases which would not be valid or enforceable under applicable law.

. . . .

b. *DISCUSSION*

(1) [public housing authorities] should be aware that many states allow persons who have not reached the age of majority to sign a lease if they have been declared an "emancipated minor." An emancipated minor is often a teenager with a child or a

9. Even if an applicant's status as a minor is considered an "attribute," RHA's minor policy is not only "reasonably related," but directly related to that attribute.

10. Section 4–2 was revised by HUD in July, 1991 to deal with applicants with handicaps. The revised version inadvertently left out the earlier provisions regarding minors. See Exhibit L to

married couple where both husband and wife are under age 18.

HUD Handbook: Admissions 7465.1 REV–2 § 4–2 [10].

Therefore, HUD specifically allowed local public housing authorities to set minimum age requirements where a lease would not be valid or enforceable under applicable state law and we believe they continue to do so.

■ Pennsylvania follows the general Restatement rule with respect to contracts of a minor. *Aetna Casualty & Surety Co. v. Duncan*, 972 F.2d 523, 526 (3d Cir.1992). Contracts of a minor, other than contracts for necessaries, are voidable by the minor, not void. *Id.* This means that a minor can render a contract a nullity by disaffirming it at any point up until a reasonable time after the minor attains his or her majority. *Id.* It does not mean a contract with a minor is a nullity prior to any such disaffirmance. *Id.* (citing *Campbell v. Sears, Roebuck & Co.*, 307 Pa. 365, 161 A. 310 (1932); *Simmons v. Parkette Nat'l Gymnastic Training Center*, 670 F.Supp. 140, 142 (E.D.Pa.1987) (applying Restatement (Second) Contracts 2d §§ 7, 14 (1981) in Pennsylvania diversity case); *Capetola v. Orlando*, 463 F.Supp. 498, 506 (E.D.Pa.1978)).

■ Moreover, the Pennsylvania Courts have made it clear that application of the rules concerning the disability of infancy should be limited by the rationale that supports them. As the Pennsylvania Supreme Court has explained, the purpose of the law is to protect minors " 'against their own lack of discretion and against the snares of designing persons' ... This 'protective cloak' is to safeguard the interests of the minor; it is not to be employed as a vehicle whereby the minor is enabled to practice unconscionable business methods. It is a shield for defense, not a sword for offense." *Pankas v. Bell*, 413 Pa. 494, 501–02, 198 A.2d 312, 315

Plaintiff's Proposed Findings of Fact and Conclusions of Law. HUD intends to continue to apply the old language regarding minors. *Id.* HUD has circulated a draft version of § 4–2 which again includes the language pertaining to minors but has not yet incorporated the draft into the Handbook. See Exhibit G to Defendants' Cross–Motion For Summary Judgment.

(1964). Under existing Pennsylvania statutory law, the age of majority for the purpose of executing an enforceable contract is eighteen.[11] Under Pennsylvania law, an individual under age eighteen can disaffirm a contract, except for necessaries, and, thus, avoid liability under the contract. *Central Bucks Aero, Inc. v. Smith,* 226 Pa.Super. 441, 442, 310 A.2d 283, 284 (1973). Having recognized that minors cannot disaffirm contracts for "necessaries," we turn now to the question of what constitutes a necessary.

■ What constitutes a necessary is not fixed, but depends upon such factors as the minor's standard of living and particular circumstances, as well as the ability and willingness of the minor's parent or guardian, if one exists, to supply the needed services or articles. *International Text–Book Co. v. Connelly,* 206 N.Y. 188, 196, 99 N.E. 722 (1912); *Bixler v. Adair,* 22 Pa. D&C.2d 732, 736 (1960). Thus, what constitutes a necessary for a particular minor is not determined by a fixed rule, but is a question of fact. *See* 43 C.J.S. *Infants* § 181 (1978).

■ Plaintiff initially asserts that shelter is *per se* a "necessary" under Pennsylvania law.[12] We must disagree. Instead, consistent with the Pennsylvania law set forth above, we believe the proper rule of law to be stated as follows: "[W]here the parent has the ability and is willing to support his minor child, board, lodging, etc., furnished to such infant by another without the parent's consent are not necessaries for which the infant is liable." 43 C.J.S. *Infants* § 181 (1978); *accord* 42 Am.Jur.2d *Infants* § 67 (1969) (citing *Guthrie v. Murphy,* 4 Watts 80 (Pa. 1835)). Therefore, it follows that if a minor

is living with a parent or guardian who is able and willing to furnish the minor with housing, housing is not a necessary and a contract entered into by the minor for housing will not be binding. Accordingly, while a court can find housing to be a "necessary," thereby withdrawing from the minor the right to disaffirm the lease, housing is not *per se* a necessary.[13] A broader rule would unnecessarily extend the liability of minors for their contracts and would be contrary to the underlying purpose of the rule. *Pankas v. Bell,* 413 Pa. 494, 501–02, 198 A.2d 312, 315 (1964).

■ Although the parties have not cited, and we have not found, any Pennsylvania cases which specifically deal with the enforceability of a minor's lease agreement for real property, decisions from numerous other jurisdictions address this exact question. *See Webster St. Partnership v. Sheridan,* 220 Neb. 9, 368 N.W.2d 439, 443 (1985) (Apartment was not a "necessary" for minor tenants who were living away from home with the understanding that they could return home at any time.); *Johnson v. Horton,* 343 S.W.2d 653 (Mo.Ct.App.1961), *cert. denied,* 368 U.S. 515, 82 S.Ct. 529, 7 L.Ed.2d 521, *reh'g denied,* 369 U.S. 842, 82 S.Ct. 870, 7 L.Ed.2d 847 (1962) (Landlord unable to recover rent for premises furnished to minor on ground that it constituted a necessary in the absence of evidence that the minor was not supplied with suitable housing by his parent or guardian.); *Magnolia Courts, Inc. v. Webb,* 63 Tenn.App. 209, 470 S.W.2d 16 (1970) (Minor lessee had the right to disaffirm a lease contract on the grounds of his minority.).[14] Therefore, we believe that un-

---

**11.** "Any individual 18 years of age and older shall have the right to enter into binding and legally enforceable contracts and the defense of minority shall not be available to such individuals." 23 Pa.Cons.Stat.Ann. § 5101(a) (1991).

**12.** Plaintiff asserts that "Pennsylvania courts have further recognized that a contract for shelter is a contract for a 'necessary.'" Plaintiff's Brief in Support of Summary Judgment, p. 17. In support of this assertion, plaintiff cites *Rundel v. Keeler,* 7 Watts 237 (Pa.1838) and *Mohney v. Evans,* 51 Pa. 80 (1865). Plaintiff overstates the law. These cases, in dicta, simply recognize that a contract for shelter can, under certain circumstances, be a contract for a necessary.

**13.** It is important to note that the issue we must decide is whether or not RHA's minor admission policy withstands judicial review in light of the Housing Act and its implementing regulations. We are not asked to, nor do we decide whether housing is a "necessary" for this particular plaintiff.

**14.** Moreover, to the extent that lodging is found by a court to be a necessary, the minor is liable not for the agreed upon lease price but only for the reasonable rent and only for the period of time the minor actually occupied the leased premises. Thus, even though lodging may be found a necessary, a minor can disaffirm the remaining portion of a lease agreement simply

der Pennsylvania law housing is not *per se* a "necessary" and that a contract for housing entered into by a minor may not, in some circumstances, be enforceable. Accordingly, we find that the section of the HUD Handbook cited above authorizes RHA's policy concerning minors so RHA can avoid entering a lease which may not be "valid or enforceable."

▪ Plaintiff also contends that a minor's emancipation from his or her parents does not enlarge or affect the minor's capacity to contract and, therefore, RHA's policy is not required because it cannot ensure the enforceability of a lease agreement with a minor. Plaintiff correctly cites *Central Bucks Aero, Inc. v. Smith,* 23 Bucks 97, 99 (1972) *aff'd,* 226 Pa.Super. 441, 310 A.2d 283 (1973) for the general rule that a minor's ability to disaffirm a contract is not affected by his emancipation from his parents. Plaintiff's Brief, pp. 17–19.

The concept and effect of emancipation can vary depending upon the context in which an emancipation determination is made. For example, parents can be relieved of their legal obligation to provide support for their minor children who are found to be emancipated under Pennsylvania Domestic Relations law.[15] In the context of Pennsylvania's public assistance programs, the concept of emancipation has a different effect. Specifically, an "emancipated minor," as defined in 55 Pa.Code § 145.62, is eligible for General Assistance. An "unemancipated minor," on the other hand, is eligible for Aid to Families of Dependent Children ("AFDC"). Thus, in

the context of Public Welfare, the definition of emancipation is a "procedural and substantive means by which public aid is distributed." *Maurer v. Maurer,* 382 Pa.Super. 468, 555 A.2d 1294, 1298 (1989). Therefore, emancipation may occur for some purposes but not for others.

One definition of emancipation is that "[a] particular disability [of minority] should no longer exist whenever the child's circumstances have so changed that the reason for creating the disability no longer exists." *Id.* (quoting Clark, *The Law of Domestic Relations in the United States,* 323–26 (2d ed. 1987)). The RHA policy in question seeks a court determination that a minor is emancipated "and is entitled to contract for necessities." As discussed below, the Court of Common Pleas of Berks County recognizes a procedure under which a minor may be found to be emancipated from the minor's parents for the "purpose of determining the minor's ability to contract." [16] *See* Affidavit of the Honorable Arthur Grim, ¶ 4. Thus, the context in which we are discussing emancipation, unlike the more general concept of emancipation discussed in *Central Bucks,* deals expressly with a minor's ability to contract.

Because the applicable court procedure determines a minor's ability to contract, it effectively decides if a minor's contracts are binding. Unless a minor is adjudicated as emancipated, a contract for housing may not be enforced, unless it is for a "necessary." In the absence of an emancipation decree and determination, RHA would not be certain whether a lease agreement will be en-

---

by vacating the leased premises. *See Gregory v. Lee,* 64 Conn. 407, 30 A. 53 (1894); *Peck v. Cain,* 27 Tex.Civ.App. 38, 63 S.W. 177 (1901).

**15.** Section 4321 of Pennsylvania's Domestic Relations law provides, in relevant part:
   (2) Parents are liable for the support of their children who are unemancipated and 18 years of age or younger.
23 Pa.Cons.Stat.Ann. § 4321 (1991). Section 4323 provides:
   (a) Emancipated child.—A court shall not order either or both parents to pay for the support of a child if the child is emancipated. 23 Pa.Cons.Stat.Ann. § 4323 (1991).

**16.** Some states have codified this procedure. For instance, Illinois and Montana expressly recognize by statute that a minor may be emancipat-

ed for the purpose of entering into valid legal contracts. Ill.Comp.Stat. ch. 750, para. 30/2 (Smith–Hurd 1992) ("The purpose of [the Emancipation of Mature Minors Act] is to provide a means by which a mature minor who has demonstrated the ability and capacity to manage his own affairs and to live wholly or partially independent of his parents or guardian, may obtain the legal status of an emancipated person with power to enter into valid legal contracts"); Mont.Code.Ann. § 41–1–306 (1991) ("A minor cannot disaffirm an obligation, otherwise valid, entered into by him.... when he has been granted limited emancipation, including a specific right to enter into contracts.").

forceable and would run the risk of entering into unenforceable contracts with minors. Because of the certainty provided by an emancipation decree and, in light of a waiting list with applicants who can enter into enforceable contracts, it is responsible and prudent for RHA to avoid such a risk. It is also reasonable and prudent for RHA to ask a court to make this determination. RHA is not a court and any determination it might make would not have the binding effect of a court's final judgment. To assume the risks of entering into unenforceable contracts would be to jeopardize sound fiscal policy as well as a fair allocation of scarce housing resources, which could well contravene the Housing Act's underlying policy promoting prompt payment of rents and "sound management practices." *See* 42 U.S.C. § 1437d(c)(4)(B).

Finally, plaintiff contends that there is no statutory provision in Pennsylvania authorizing the courts to enter an emancipation decree; that there are no Pennsylvania cases recognizing a minor's common law right to petition a court to obtain an emancipation decree; and that there are no rules of court in Pennsylvania establishing a procedure for obtaining a judicial emancipation decree. In response, defendants have submitted the affidavit of the Honorable Arthur Grim of the Family, Juvenile · and Orphan's Court Divisions of the Court of Common Pleas, Berks County. Judge Grim, who is the Administrative Head of Orphan's Court and Juvenile Court, states:

4. Though perhaps not commonly pursued, there is a nonstatutory procedure by which a minor may petition the Court of Common Pleas for an adjudication that the minor is emancipated from his or her parent or guardian for purposes of determining the minor's ability to contract for, among other things, housing.

5. The aforementioned emancipation proceeding may be commenced by petition filed with the Clerk of Court, docketed as a Miscellaneous Action, and would involve a

hearing in which factual evidence is presented concerning the minor's status.

6. A petition for emancipation would be assigned to a Judge presiding over juvenile and/or family matters and would be heard in Miscellaneous Court.

(Affidavit of the Honorable Arthur Grim.)

In light of this uncontroverted evidence, we find in the case before us that a state court procedure does exist by which a minor may obtain an impartial court adjudication that the minor is emancipated from his or her parent or guardian for the express "purposes of determining the minor's ability to contract for, among other things, housing." Plaintiff raises several additional questions about the court procedure described by Judge Grim.[17] We will not look beyond Judge Grim's affidavit nor will we speculate or presume to tell the Court of Common Pleas what procedures it should follow. It is sufficient to note that the Pennsylvania Courts of Common Pleas possess broad original jurisdiction, including equitable jurisdiction. Pa. Constitution art. V, § 5(b); 42 Pa.Cons.Stat.Ann. §§ 323, 931(a) (1981). The Pennsylvania Declaratory Judgment Act, 42 Pa.Cons.Stat.Ann. § 7532 (1982), gives the court the power to declare "rights, status and other legal relations." Section 7534 allows the court to construe a contract prior to its breach. 42 Pa.Cons.Stat.Ann. § 7534 (1982).

For the foregoing reasons, we find that RHA's policy requiring minor applicants first to obtain a judicial decree of emancipation is: (A) in harmony with the overall policies of the Housing Act; and (B) consistent with and specifically authorized by the cited HUD regulations.

## C. DUE PROCESS CLAIM

Plaintiff's last claim is that RHA's admission policy violates the Due Process Clause of the Fourteenth Amendment because it creates an "irrebuttable presumption" that all minor applicants who do not obtain an

---

17. Plaintiff questions: (1) the standard applied in such a procedure to determine emancipation; (2) what authority, either statutory or common law, the court would rely upon in entering a emancipation decree; and (3) in the absence of any rules of the court governing such procedures, how a minor would know how to proceed. Plaintiff's Brief in Opposition to Defendants' Cross–Motion for Summary Judgment, pp. 14–15.

emancipation decree are unable to enter into enforceable contracts for necessaries. This argument is based on a concept of substantive due process, described in some older Supreme Court decisions as "the irrebuttable presumption doctrine." In these cases, the Supreme Court struck down statutes which created irrebuttable presumptions which were not universally true and which did not grant an individual an opportunity to rebut the presumption. *Vlandis v. Kline,* 412 U.S. 441, 93 S.Ct. 2230, 37 L.Ed.2d 63 (1973); *see also Turner v. Dep't of Employment Security,* 423 U.S. 44, 96 S.Ct. 249, 46 L.Ed.2d 181 (1975); *Cleveland Bd. of Educ. v. LaFleur,* 414 U.S. 632, 94 S.Ct. 791, 39 L.Ed.2d 52 (1974); *United States Dep't of Agric. v. Murry,* 413 U.S. 508, 93 S.Ct. 2832, 37 L.Ed.2d 767 (1973); *Stanley v. Illinois,* 405 U.S. 645, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972); *Bell v. Burson,* 402 U.S. 535, 91 S.Ct. 1586, 29 L.Ed.2d 90 (1971).

In *Vlandis,* the Supreme Court held unconstitutional an "irreversible and irrebuttable statutory presumption" that a student who applied to a state school from out of state remained classified as a non-resident, subject to substantially higher tuition, for the entire period of attendance. *Id.* 412 U.S. at 445, 93 S.Ct. at 2233. Plaintiff argues that RHA's minor policy fails to meet the *Vlandis* two-prong test under which an irrebuttable presumption violates due process: (1) when the presumption "is not necessarily or universally true in fact;" and (2) when the "State has reasonable alternative means of making the crucial determination." *Id.* at 452, 93 S.Ct. at 2236. Thus, plaintiff argues that RHA's minor policy is unconstitutional because it is not necessarily or universally true that minor applicants who are unable to obtain court emancipation decrees are unable

to enter into enforceable contracts for necessaries [18]; and because a reasonable alternative is available to RHA to determine for itself whether a minor applicant is able to enter into an enforceable lease for housing.[19]

Plaintiff's reliance on these line of cases is misplaced because subsequent Supreme Court and Third Circuit cases have established that the irrebuttable presumption analysis is inapplicable to challenges to aspects of social welfare programs. *Weinberger v. Salfi,* 422 U.S. 749, 95 S.Ct. 2457, 45 L.Ed.2d 522 (1975); *Jackson v. O'Bannon,* 633 F.2d 329, 339 (3d Cir.1980); *see also Malmed v. Thornburgh,* 621 F.2d 565 (3d Cir.1980). In *Salfi,* the Court reviewed a provision of the Social Security Act which disallowed survivorship benefits to widows married to the deceased for less than nine months prior to his death. Although this provision created an irrebuttable presumption that the marriage was collusively entered into in order to receive benefits after the expected death of an ill wage earner, the Court upheld the requirement, finding that " 'the Due Process Clause can be thought to interpose a bar only if the statute manifests a patently arbitrary classification, utterly lacking in rational justification.' " *Salfi,* 422 U.S. at 768, 95 S.Ct. at 2468 (quoting *Flemming v. Nestor,* 363 U.S. 603, 611, 80 S.Ct. 1367, 1373, 4 L.Ed.2d 1435 (1960)); *see Schweiker v. Hogan,* 457 U.S. 569, 588–92, 102 S.Ct. 2597, 2608–11, 73 L.Ed.2d 227 (1982); *Schweiker v. Wilson,* 450 U.S. 221, 230, 101 S.Ct. 1074, 1080, 67 L.Ed.2d 186 (1981); *United States R.R. Retirement Bd. v. Fritz,* 449 U.S. 166, 174–76, 101 S.Ct. 453, 459–60, 66 L.Ed.2d 368 (1980); *Califano v. Jobst,* 434 U.S. 47, 52–54, 98 S.Ct. 95, 98–100, 54 L.Ed.2d 228 (1977); *Dandridge v. Williams,* 397 U.S. 471, 485–86,

---

18. This argument considers a scenario, unlike the present case, in which parents do not provide support and a minor actually applies for and is nevertheless denied an emancipation decree by a court. Although parents are under a legal obligation to provide support, it is possible that they both would be unable or unwilling to do so. In this unlikely hypothetical situation, the minor would be unemancipated and yet might contract for those necessaries not supplied by the parent. We realize that RHA's admission policy could hypothetically exclude certain minors who are unable to obtain an emancipation decree but for

whom housing may nonetheless be a necessary. However, just because a rule is under-inclusive or over-inclusive does not render it unconstitutional. *Weinberger v. Salfi,* 422 U.S. 749, 781, 95 S.Ct. 2457, 2474–75, 45 L.Ed.2d 522 (1975). We also note that Pennsylvania has extensive provisions which provide care for any minor in such a position. 42 Pa.Cons.Stat.Ann. § 6301 (1982).

19. We have already discussed the pitfalls of RHA making this determination for itself.

90 S.Ct. 1153, 1161–62, 25 L.Ed.2d 491 (1970).

Using this rational basis standard of scrutiny, we see no difficulty in upholding RHA's minor policy. As discussed above, RHA's minor policy was motivated in part by a section of the HUD Handbook which expressly authorized local public housing authorities to set a minimum age for admission. This provision of the HUD Handbook also furthers Congress' goal of encouraging sound management and ensuring the prompt collection of rents. As we noted above, a court finding of emancipation will also determine the minor's ability to contract. Thus, the challenged policy helps RHA avoid entering leases which may not be enforced against the minor. In seeking to allocate scarce public resources, we find that it is rational and consistent with the purposes of the Housing Act for a local housing authority to establish eligibility requirements which help to ensure the enforceability of lease agreements. Therefore, we believe that RHA's minor policy is based on a rational justification and does not deny due process rights.

### V. *CONCLUSION*

For the foregoing reasons, we find that RHA's minor applicant policy does not violate the Housing Act, its implementing regulations or the Due Process clause of the Fourteenth Amendment. Accordingly, defendants' Motions for Summary Judgment is granted.

An appropriate order follows.

### *ORDER*

AND NOW, this 25th day of January, 1993, upon consideration of the Plaintiff's Motion for Summary Judgment filed on August 13, 1992, Defendant's Cross–Motion for Summary Judgment or, in the alternative, Motion to Dismiss filed on August 28, 1992 and Plaintiff's Opposition to Defendants' Cross–Motion filed on September 15, 1992, it is hereby ORDERED that:

1. Defendants' Motion for Summary Judgment is GRANTED;

2. Defendants' Alternative Motion to Dismiss is DENIED as moot;

3. Plaintiff's Motion for Summary Judgment is DENIED; and

4. Judgment is entered in favor of Defendants. This case is CLOSED.