Daniel CATLIN and Dundeen Catlin, individually and as parents and natural guardians of Dunbar Elliot, a/k/a "Dell" Catlin, a handicapped child, Plaintiffs,

v.

Thomas SOBOL, as Commissioner of Education of the State of New York, John F. Holdorf, as Superintendent of Schools of the Edmeston Central School District, and The Board of Education of The Edmeston Central School District, Defendants.

No. 86–CV–222.

United States District Court, N.D. New York.

March 30, 1995.

Anderson, Banks, Moore, Curran & Hollis, Mount Kisko, NY (Lawrence Thomas, James P. Drohan, of counsel), for plaintiffs.

Dennis C. Vacco, Atty. Gen. of the State of N.Y., Dept. of Law, Albany, NY (Lawrence

Doolittle, Asst. Atty. Gen., of counsel), for defendant Thomas Sobol.

Hogan & Sarzynski, Binghamton, NY (Edward Sarzynski, of counsel), for defendants John F. Holdorf and the Board of Educ. of the Edmeston Cent. School Dist.

## MEMORANDUM–DECISION AND ORDER

MUNSON, Senior District Judge.

Plaintiffs move to reinstate the court's September 3, 1986 Memorandum–Decision and Order granting in part their cross-motion for summary judgment against defendants. In that decision, the court held that New York Education Law § 3202(4)(b), as applied to plaintiff Dunbar ("Dell") Catlin, violates the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution. *See* Memorandum–Decision and Order, Document ("Doc.") 12, *reported as Catlin v. Ambach,* 644 F.Supp. 161 (N.D.N.Y.1986). Plaintiffs also seek leave to re-submit their application for attorney's fees as prevailing parties within the meaning of 42 U.S.C. § 1988. Defendants oppose plaintiffs' motions and cross-move for summary judgment.

## I. UNDISPUTED FACTS

Plaintiff Dunbar Elliot ("Dell") Catlin was born in 1973. His biological parents are plaintiffs Daniel and Dundeen Catlin (the "Catlins"), who resided in Bedford, New York at the time of Dell's birth. The Catlins learned soon after Dell's birth that he suffered from Down's Syndrome, and would be mentally retarded his entire life. After consulting with various professionals and family members, the Catlins placed Dell in a family home in Edmeston, New York, owned and operated by Samuel and Elizabeth Conde

(the "Condes"). Their decision to do so was based on the Condes' experience in operating a licensed foster home, in which approximately 25 Down's Syndrome children had been cared for and housed. Transcript of Daniel Catlin's Testimony of July 1, 1986 (hereinafter "Dl. Catlin T."), Doc. 48, at 22–23; Transcript of Elizabeth Conde's Testimony of July 1, 1986 (hereinafter "E. Conde T."), Doc. 48, at 43. The Catlins believed the Condes' experience and expertise could provide Dell with certain care and advantages which the Catlins themselves were unable to offer. Dl. Catlin T., Doc. 48, at 22.

The Catlins always intended Dell to reside permanently with the Condes. *Id.* at 32. Dell was transported directly from the hospital where he was born to the Condes' Edmeston home. *Id.* at 24. He has never visited his biological parents' homes. *Id.* at 24–25; E. Conde T., Doc. 48, at 46. Nonetheless, the Catlins pay for the costs associated with Dell's care at the Condes'. Dl. Catlin T., Doc. 48, at 25–26. No part of those costs is borne by any social service agency. *Id.* at 26.

The Condes' is the only home Dell knows and the people with whom he lives are, in most senses, his family.[1] Dell refers to the Condes as "Mama" and "Dad" and has long-standing, extended family relationships with two of the Condes' biological children who reside in the area. Dell shares a room with Seamus Varney. Seamus, one year younger than Dell, has Down's Syndrome and has lived with the Condes in Edmeston since shortly after his birth. Dell and Seamus consider themselves brothers. They attend school together, and have become virtually inseparable over the years.[2] E. Conde T., Doc. 48, at 45–46.

The Condes are completely responsible for day-to-day decisions regarding Dell's care

---

[1] In testimony before this court, Daniel Catlin noted that "in everything but the biological sense, [the Condes] are [Dell's] parents." Dl. Catlin T., Doc. 48, at 25.

[2] At the time the instant motion was argued, Dell lived with the Condes. In August, 1991 the Condes retired, and Dell went to live with another family in Edmeston, under substantially similar circumstances. *See* Daniel Catlin Affidavit, Doc. 43, at ¶ 2. Nonetheless, for purposes of

clarity, the court writes as if Dell still resides with the Condes. The analysis of Dell's residency status in Edmeston for purposes of New York Education Law § 3202(4)(b) is the same whether he lives with the Condes or some other household within Edmeston school district. Furthermore, any move by Dell does not moot the issues in this case, because defendants seek past tuition from plaintiffs for the period in which Dell resided with the Condes.

and supervision. E. Conde T., Doc. 48, at 47–48. They arrange for his appointments and accompany him to the doctor, dentist, and barber, while also ensuring that he knows the neighbors, the postman, and others with whom he has regular contact. *Id.* at 54–5. Through the Condes, Dell has become a part of the Edmeston community.

Dell attends the Primary Trainable Mentally Retarded Program at the Board of Cooperative Educational Services—Mt. Vision School in Green County ("BOCES—Mt. Vision School"), within Edmeston Central School District ("Edmeston Central").[3] Dell is friendly with his schoolmates and teachers, and has attended school since 1978. Throughout his school-age years, Edmeston Central has dealt exclusively with the Condes concerning Dell's day-to-day educational needs. For example, Edmeston Central contacts the Condes when school is cancelled for the day, when the school needs parental consent forms for Dell to attend school functions, and when Dell becomes ill while at school. *Id.* at 52. It is clear from these facts that the center of Dell's civic, social, and family life is in Edmeston, New York. Both the Catlins and the Condes believe that it would be extremely harmful for Dell to leave Edmeston and the home the Condes have provided him. *Id.* at 55–56; D1. Catlin T., Doc. 48, at 32.

Dell's attendance at the BOCES—Mt. Vision School was based upon the recommendation of the Edmeston Central School District's Committee on the Handicapped ("Edmeston COH"). From the time he started school in 1978 through the spring of 1985, the Edmeston COH and the Committee on the Handicapped from Bedford Central School District ("Bedford Central") jointly established and reviewed Dell's educational placement.

In April of 1985, the Catlins moved from their home in Bedford, New York to Nantucket, Massachusetts. From the beginning of Dell's education in 1978, Bedford Central had financed Dell's education at Edmeston Central. As the district in which Dell's parents lived, Bedford Central believed it was responsible for Dell's education under New York Education Law § 3202(4)(b). Once the Catlins moved, however, Bedford Central promptly informed Edmeston Central that it would no longer pay Dell's tuition, and would not continue to be involved in reviewing Dell's educational placement. *See* July 17, 1985 Letter From Melvin Schwager, Ph.D., Director of Special Services, Bedford Central School District, Exhibit ("Exh.") 20, attached to Doc. 2. Since then, the Edmeston COH has been solely responsible for Dell's placement. Bedford Central also advised the Nantucket Public School District of its belief that, because the Catlins' new residence was in Nantucket, the burden of educating Dell fell on the Nantucket Public School District. *See* October 4, 1985 Letter From Melvin Schwager, Exh. 21, attached to Doc. 2. Edmeston Central subsequently notified the Catlins that Dell could no longer attend public school in that district unless the Catlins, or the Nantucket Public School District, assumed financial responsibility for Dell's education. The Catlins appealed Edmeston Central's decision to the Commissioner of Education of the State of New York ("the Commissioner" or "Commissioner of Education"). In a written decision dated January 14, 1986, the Commissioner affirmed the decision of Edmeston Central.[4] The instant litigation ensued.[5]

---

3. Dell graduated from the Edmeston school system in June, 1994. *Daniel Catlin Affidavit, Doc. 43,* at ¶ 3. For purposes of clarity the court writes as if Dell were still attending school.

4. While the record is vague concerning the process afforded plaintiffs, the Commissioner's decision reveals that plaintiffs were both represented by counsel and allowed to articulate their arguments, at least for purposes of appeal. *See* Decision, Exh. A attached to Doc. 22.

5. Massachusetts officials have informally indicated to the Catlins that the State of Massachusetts is not willing to bear the cost of Dell's education at Edmeston Central. To the court's knowledge, plaintiffs have not pursued the issue beyond that informal statement of position. Dell's schooling in the Primary Trainable Mentally Retarded program at the BOCES—Mt. Vision School has not been interrupted. Edmeston Central paid for Dell's schooling continuously since Bedford Central ceased paying in 1985.

## II. PROCEDURAL HISTORY

The New York State Constitution mandates that "the legislature shall provide for the maintenance and support of a system of free common schools, wherein all the children of this state may be educated." N.Y. CONST. art. XI, § 1. The state legislature fulfilled this mandate by enacting New York Education Law § 3202, the first subsection of which places the obligation to provide public schooling without payment of tuition on the school district in which a child resides. N.Y.Educ.Law § 3202(1). For children living in free family homes or family homes at board, as in the instant case,[6] the statute provides:

> when such family homes shall be the actual and only residence of such children and when such children are not supported and maintained at the expense of a social services district or of a state department or agency, [such children] shall be deemed residents of the school district in which such family home is located.

N.Y.Educ.Law § 3202(4)(b) (emphasis added). Children living in family homes at board which are *not* their "actual and only residence" are not entitled to have their education funded by the school district in which the family home at board is located. N.Y.Educ.Law § 3202(4)(b).

In refusing to fund Dell's education, Edmeston Central took the position that the Condes' home was not Dell's "actual and only residence" for purposes of § 3202. *See* August 1, 1985 Letter From John F. Holdorf, Superintendent of Edmeston Central, Exh. 1 attached to Doc. 1. In upholding Edmeston Central's actions in his January 14, 1986 decision, the Commissioner of Education applied the common law presumption that a child resides with his biological parents even when the child is not physically present in the parents' home. According to the Commissioner, this presumption can be overcome only by a showing that the parents neither exercise control, nor maintain financial responsibility, over the child. The Catlins could not make such a showing, and therefore could not rebut the presumption that

Dell resides with them. *See* Decision, Exh. A attached to Doc. 22, at 2. Hence, the Commissioner concluded, Edmeston Central's determination that the Condes' was not Dell's "actual and only residence" was not arbitrary, capricious, or unreasonable. *Id.*

On February 27, 1986, plaintiffs filed their complaint in this court alleging that New York Education Law § 3202(4)(b), as interpreted by the Commissioner and enforced by Edmeston Central in this case, violates the Equal Protection and Due Process Clauses of the Fourteenth Amendment and also the Privileges and Immunities Clause of Article IV, Section 2 of the United States Constitution. Damages were sought under 42 U.S.C. § 1983, the Education for All Handicapped Children Act ("EHA"), 20 U.S.C. §§ 1400–85 (now called the Individuals with Disabilities Education Act or "IDEA"), and the Rehabilitation Act of 1973, 29 U.S.C. § 794.

Defendants Edmeston Central and its Superintendent, John Holdorf, moved to dismiss the action for lack of subject matter jurisdiction and failure to state a claim upon which relief can be granted, pursuant to Rules 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure, respectively. In the alternative, defendants moved for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure. At plaintiffs' request, the court scheduled a factual hearing on July 1, 1986 addressing the question of Dell's residence. Daniel Catlin and Elizabeth Conde testified on behalf of plaintiffs. Defendants presented no witnesses. At the close of the hearing, plaintiffs orally cross-moved for summary judgment. The Commissioner also moved for summary judgment. The court granted plaintiffs' motion for summary judgment, holding that New York Education Law § 3202(4)(b), as applied by the Commissioner and Edmeston Central to Dell Catlin, violates the Equal Protection Clause of the Fourteenth Amendment. *Catlin v. Ambach*, 644 F.Supp. 161, 166–68 (N.D.N.Y.1986).

The United States Court of Appeals for the Second Circuit vacated this court's deci-

---

**6.** The parties agree that for purposes of determining Dell's residency, the Condes' home is a "family home at board" within the meaning of New York Education Law § 3202(4)(b).

sion without reaching the merits, noting that no state court had yet ruled on the meaning of "actual and only residence." *Catlin v. Ambach,* 820 F.2d 588, 591 (2d Cir.1987). Citing *R.R. Comm'n of Texas v. Pullman Co.,* 312 U.S. 496, 61 S.Ct. 643, 85 L.Ed. 971 (1941), the Circuit Court noted that a constitutional advisory opinion should be avoided where the dispute concerns an undecided but potentially controlling issue of state law. *Id.* Because a state court ruling that the Commissioner erred in his interpretation of "actual and only residence" might obviate the need for a constitutional ruling, the Circuit Court remanded with instructions to retain jurisdiction of the case pending resolution of the issue by the state courts. *Id.*

Following the ruling by the Circuit Court, the Catlins commenced an action for declaratory judgment in New York State Supreme Court, Albany County. Meanwhile, Edmeston Central brought an action for unpaid tuition against the Catlins in New York State Supreme Court, Otsego County. The two actions were consolidated in the Albany County Supreme Court, and summary judgment was granted in favor of the Catlins. The court concluded that New York Education Law § 3202(4)(b) creates a class of children, including Dell, who are not subject to the common law presumption of residency with their biological parents. *Catlin v. Sobol,* 141 Misc.2d 169, 172, 532 N.Y.S.2d 1006, 1008–09 (Albany Cty. S.Ct.1988).

On appeal, the Appellate Division, Third Department unanimously disagreed with the trial court's interpretation of § 3202, but nonetheless affirmed in a divided decision based on the statute's application to the facts of the case. *Catlin v. Sobol,* 155 A.D.2d 24, 28–32, 553 N.Y.S.2d 501, 503–06 (3d Dep't 1990). Emphasizing the absurdity that the Commissioner's interpretation and application of § 3202 required "nonresident parents to default on their obligation to support their child and relinquish their parental rights" in order to rebut the residency presumption, the Third Department held that this result was contrary to the intent of the state legislature. *Catlin,* 155 A.D.2d at 29, 553 N.Y.S.2d at 504. Rather than focusing exclusively on the Catlins' retention of legal con-

trol over Dell to determine his residency, the majority held that the Commissioner should have taken into account Dell's continuous physical presence in Edmeston and the unmistakable intent of the Catlins that Dell remain permanently with the Condes. Upon such facts, the majority held, the Commissioner could not rationally have concluded that plaintiffs failed to rebut the residency presumption. Thus the majority upheld the trial court's award of summary judgment to plaintiffs. *Id.* at 30–32, 553 N.Y.S.2d at 504–05.

A divided New York State Court of Appeals reversed, agreeing with the Commissioner's interpretation of the statute and concluding that the Commissioner's application of the statute was not arbitrary, capricious, or without a rational basis. *Catlin v. Sobol,* 77 N.Y.2d 552, 558–62, 571 N.E.2d 661, 664–67, 569 N.Y.S.2d 353, 356–59 (1991). In so holding, the Court of Appeals expressly rejected plaintiffs' position that Dell's physical presence in the district is enough to satisfy the residency requirement. The Court highlighted that the Catlins maintain complete legal authority over Dell and have taken an active role in planning his educational program, concluding that those facts provided a rational basis for the Commissioner's decision. *Catlin,* 77 N.Y.2d at 561–62, 571 N.E.2d at 666–67, 569 N.Y.S.2d at 358–59. The Court reversed the entry of summary judgment for plaintiffs, granted summary judgment for defendants, and remitted the case to the Albany County Supreme Court to determine the tuition owed to Edmeston Central. *Id.* at 562–63, 571 N.E.2d at 667, 569 N.Y.S.2d at 359.

■ Having lost in New York State's highest court, plaintiffs returned to this court, moving to reinstate the court's September 3, 1986 Memorandum–Decision and Order granting plaintiffs partial summary judgment and declaring New York Education Law § 3202(4)(b) unconstitutional as applied to Dell Catlin. Because the court finds no procedural provision addressing a motion to reinstate a vacated decision, it construes plaintiffs' papers as noticing a renewed motion for summary judgment pursuant to Federal Rule of Civil Procedure 56.

Plaintiffs also seek leave to re-submit their application for attorney's fees as prevailing parties within the meaning of 42 U.S.C. § 1988. The original application was filed in this court following the State Supreme Court's ruling in plaintiffs' favor. The court denied the application from the bench after oral argument on November 27, 1989, noting that the application was premature and that, given the Second Circuit's vacatur of this court's previous decision, plaintiffs failed to establish "prevailing party" status within the meaning of § 1988.

Defendant Commissioner of Education cross-moves for summary judgment dismissing the complaint. Defendants Holdorf and Edmeston Central cross-move separately for summary judgment dismissing the complaint.

## III. DISCUSSION

### A. Jurisdiction

■ The court begins its analysis by addressing three jurisdictional issues raised by defendants Holdorf and Edmeston Central. Defendants first argue that the court lacks jurisdiction over plaintiffs' claims under 42 U.S.C. § 1983 because plaintiffs failed to initiate, follow, and exhaust the detailed procedural mechanisms established by the IDEA. See 20 U.S.C. § 1415 (specifying procedures for parties aggrieved by administrative decisions concerning educational programs for handicapped children residing in states receiving IDEA funding). Defendants Holdorf and Edmeston Central point out that plaintiffs failed to seek an impartial hearing pursuant to 20 U.S.C. § 1415(b)(2) regarding their complaint that Edmeston was not providing a free appropriate public education. Defendants contend that plaintiffs' failure to exhaust their administrative remedies is an incurable defect in this court's subject matter jurisdiction over the controversy.

The court addressed this argument in its September 3, 1986 Memorandum–Decision and Order, and defendants point to no case law issued since that time which alters the principles the court applied in rejecting the argument. See Catlin, 644 F.Supp. at 161–63. The overarching principle continues to be the United States Supreme Court's statement in Smith v. Robinson that, "[w]here the

EHA is available to a handicapped child asserting a right to a free appropriate public education, based either on the EHA or the Equal Protection Clause of the Fourteenth Amendment, the EHA is the exclusive avenue through which the child and his parents or guardian can pursue their claim." 468 U.S. 992, 1013, 104 S.Ct. 3457, 3469, 82 L.Ed.2d 746 (1984). Similarly, the Second Circuit has held that the "elaborate, precisely defined administrative and judicial enforcement system" contemplated by 20 U.S.C. § 1415 is the exclusive remedy for a handicapped child aggrieved by an administrative decision which affects his or her educational program, and should not be supplemented or replaced by an action under 42 U.S.C. § 1983. Quackenbush v. Johnson City Sch. Dist., 716 F.2d 141, 147 (2d Cir.1983), cert. denied, 465 U.S. 1071, 104 S.Ct. 1426, 79 L.Ed.2d 750 (1984).

Nonetheless, § 1983 has been used as a remedy when the provisions of § 1415 are not "available" within the meaning of Smith v. Robinson. For example, the Quackenbush court permitted a plaintiff's § 1983 claim on behalf of her learning-disabled son to go forward on the specific facts presented in that case, as defendants had committed an act of forgery to purposefully deprive plaintiff of the procedural safeguards set forth in § 1415. Quackenbush, 716 F.2d at 147–48. In Blazejewski v. Board of Educ. of Allegany Cent. Sch. Dist., 599 F.Supp. 975, 978 (W.D.N.Y.1985), the district court ruled that the parents of a learning-disabled child properly invoked § 1983 for their due process claim when the defendant school board refused to hold a § 1415(b)(2) hearing to discuss initiating a special education program for the child. Noting that "[t]he evil which the [Supreme Court in Smith v. Robinson] sought to avoid was the possibility that plaintiffs would avoid the procedures of the EHA and the local/state jurisdiction over educational placements," the Blazejewski court also approved plaintiffs' resort to § 1983 to obtain a preliminary injunction enforcing the administrative decision rendered as a result of the first phase of the litigation. Blazejewski, 599 F.Supp. at 979–80 (footnote omitted). The court ruled that judicial review under

§ 1415(e)(2) was not "available" on the facts before it because plaintiffs were not aggrieved by an administrative decision regarding the child's educational placement in either phase of the case. Rather, they were aggrieved first by the school board's refusal to hold a hearing, and second by the board's failure to implement the administrative decision rendered after the hearing. Thus, the *Blazejewski* court concluded that plaintiffs' claims were properly brought under § 1983.

This court finds plaintiffs at bar to be in a comparable position to that of the *Blazejewski* plaintiffs. Plaintiffs in the instant case are not aggrieved by an administrative decision regarding Dell Catlin's educational placement. Indeed, from the record it appears that Dell has continued to receive satisfactory educational services throughout the long pendency of this litigation. What aggrieves plaintiffs are defendants' determination that Dell is not a resident of Edmeston within the meaning of New York Education Law § 3202(4)(b), and their resulting insistence that he is not entitled to attend the public schools in Edmeston Central School District unless the Catlins or their school district of residence in Massachusetts assume financial responsibility for his education. By framing the issue before the court as a § 1983 claim, plaintiffs do not seek to circumvent the administrative procedures of the IDEA, because those procedures are not designed to address challenges to state residency requirements. Instead, New York State law mandates that plaintiffs appeal the adverse residency determination of Edmeston Central to the Commissioner of Education, which is precisely what plaintiffs did. N.Y.Educ.Law § 310(4).[7] Only upon receiving the unfavorable decision of the Commissioner did plaintiffs file their complaint in

this court. The impartial due process hearing procedure set forth in § 1415(b)(2) of the IDEA has no application here, as the "State educational agency" named in that provision is in no position to review the decision of its own Commissioner regarding Dell Catlin's residency.[8] Therefore, the court holds that neither the administrative procedures in § 1415(b)(2) nor the corresponding judicial review provided for in § 1415(e)(2) are "available" to plaintiffs in this case, and plaintiffs' consequent resort to § 1983 to pursue their constitutional claims is proper. As such, defendants' first challenge to the court's subject matter jurisdiction is unavailing.

█ Defendants' second jurisdictional argument is that the court lacks subject matter jurisdiction because the instant case involves a question purely for state adjudication. Defendants rely on authority which states that a district court should not take jurisdiction over a case "purely and singularly for state adjudication." *Fallon v. State Bd. of Elections*, 408 F.Supp. 636, 639 (S.D.N.Y.1976). Although premised on a valid legal principle, defendants' argument is inapposite in the instant case.

As defendants Holdorf and Edmeston Central assert in their motion papers, *Fallon* is a case where the plaintiff's primary thesis was that the defendant Board of Elections misconstrued state statutes relevant to potential delegates to the 1976 Democratic National Convention. In dismissing the case for lack of subject matter jurisdiction, the *Fallon* court stated that "[w]hether the state agency's interpretation is wrong is not a question of federal law at all so long as the interpretation does not render the statute unconstitutional." 408 F.Supp. at 639. Were the case

7. This provision was subsequently supplemented by N.Y.Comp.Codes R. & Regs. tit. 8, § 100.2(y)(4).

8. Particularly since the Commissioner's interpretation of New York Education Law § 3202(4)(b) has been adopted by the New York Court of Appeals in this case, "[i]t is highly unlikely that forcing the parties to undergo a costly and time consuming sojourn through [additional administrative procedures] would shed further light on this dispute." *Major v. Nederland Indep. Sch. Dist.*, 772 F.Supp. 944, 947 (E.D.Tex.1991)

(court found equal protection violation in Texas district's policy requiring student to live in district with parents or legal guardian, regardless of primary purpose for student's presence in the district, in order to attend public schools free of charge). An impartial due process hearing under IDEA § 1415(b)(2) obviously would not aid in resolving the dispute at bar, as the agency personnel conducting the hearing are bound by the decision of the New York Court of Appeals affirming the Commissioner's interpretation and application of Education Law § 3202(4)(b).

at bar purely a matter of statutory construction, defendants would be on solid ground in urging the court to follow *Fallon* and dismiss for lack of jurisdiction. It is not. Plaintiffs do not claim that defendants or the New York State Court of Appeals misconstrued New York Education Law § 3202(4)(b).[9] Rather, plaintiffs claim that defendants and the Court of Appeals construed the statute in a manner which violates Dell Catlin's rights under the United States Constitution, thereby creating a federal cause of action under the umbrella of 42 U.S.C. § 1983. *See American Well Works Co. v. Layne & Bowler Co.*, 241 U.S. 257, 260, 36 S.Ct. 585, 586, 60 L.Ed. 987 (1916) ("A suit arises under the law that creates the cause of action") (Holmes, J.). Hence, this court's analysis will not focus on the construction of the statute, but will address instead the application of the statute to the facts at bar. Viewed in this light, defendants' second jurisdictional challenge also is unavailing.

■ Defendants' final jurisdictional argument is that the Catlins should be required to explore whether their current school district of residence in Massachusetts will pay for Dell's education before this case proceeds any further. The court disagrees, as it did when this argument was raised in 1986. *Catlin*, 644 F.Supp. at 165. Whether, as a practical matter, a school district in Massachusetts or any other state would assume the costs for Dell's education is irrelevant to the legal issue before the court, namely, whether New York Education Law § 3202(4)(b), as applied to plaintiff Dell Catlin, violates plaintiffs' rights under the United States Constitution.

In sum, the court is satisfied that it has jurisdiction to consider plaintiffs' § 1983 claims.

### B. Standards for Summary Judgment

Under Federal Rule of Civil Procedure 56(c) summary judgment shall enter if, when viewing the evidence in the light most favorable to the nonmovant, the court determines that there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); *Eastman Kodak Co. v. Image Technical Servs., Inc.*, 504 U.S. 451, 456–58, 112 S.Ct. 2072, 2077, 119 L.Ed.2d 265 (1992); *Commander Oil v. Advance Food Serv. Equip.*, 991 F.2d 49, 51 (2d Cir.1993). In assessing such a motion, the court "cannot try issues of fact; it can only determine whether there are issues to be tried." *Donahue v. Windsor Locks Bd. of Fire Comm'rs*, 834 F.2d 54, 58 (2d Cir.1987); *see Gallo v. Prudential Residential Servs. Ltd. Partnership*, 22 F.3d 1219, 1224 (2d Cir.1994). The parties in the instant case agree that there are no material issues of fact in dispute. Thus the case may be resolved as a matter of law.

### C. Equal Protection Claim

■ The court first addresses plaintiffs' claim that New York Education Law § 3202(4)(b) violates the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution.[10] That Amendment proscribes states from denying "any person within its jurisdiction the equal protection of the laws." U.S. CONST. amend. XIV, § 1. Put simply, the Equal Protection Clause is "a direction that all persons similarly situated should be treated alike." *City of Cleburne v. Cleburne Living Ctr., Inc.*, 473

---

**9.** Such a claim clearly would be untenable because federal courts are bound by the construction given a state statute by the state's highest court. *Schad v. Borough of Mount Ephraim*, 452 U.S. 61, 65, 101 S.Ct. 2176, 2180–81, 68 L.Ed.2d 671 (1981); *Auerbach v. Rettaliata*, 765 F.2d 350, 352 (2d Cir.1985).

**10.** Plaintiffs' constitutional challenges are part of their claim under 42 U.S.C. § 1983. As recently stated by the Second Circuit, "[s]ection 1983 provides an instrument by which an individual deprived of a federal right by a person acting under color of state law may be compensated."

*Eagleston v. Guido*, 41 F.3d 865, 875 (2d Cir. 1994) (citation omitted). It is well established that in order to justify relief under § 1983, plaintiffs must show (1) that they were deprived of a right, privilege, or immunity secured by the Constitution or law of the United States, and (2) that the conduct causing the deprivation was attributable at least in part to a person acting under color of state law. *Id.* at 875–76. Because defendants concede that they acted under color of state law, the court focuses exclusively on whether plaintiffs were deprived of a constitutional right.

U.S. 432, 105 S.Ct. 3249, 87 L.Ed.2d 313 (1985).

■ To decide whether a law violates the Equal Protection Clause, the court looks to three things: the character of the classification in question; the individual interests affected by the classification; and the governmental interests offered in support of the classification. *Dunn v. Blumstein,* 405 U.S. 330, 335, 92 S.Ct. 995, 999, 31 L.Ed.2d 274 (1971). Because the Supreme Court has developed more than one mode of analysis for Equal Protection challenges, the first issue in every equal protection dispute is which standard of scrutiny to apply to the facts and laws in controversy.

*1. The Applicable Standard*

■ With most forms of state action, courts will analyze the facts and laws to determine whether the classification at issue bears some rational relationship to a legitimate public purpose. *E.g., Heller v. Doe,* —— U.S. ——, ——, 113 S.Ct. 2637, 2642, 125 L.Ed.2d 257 (1993). However, when a classification disadvantages a "suspect class" or the individual interest at stake involves the exercise of a "fundamental right," courts strictly scrutinize the classification to determine if it is "precisely tailored to serve a compelling governmental interest." *Plyler v. Doe,* 457 U.S. 202, 216–17, 102 S.Ct. 2382, 2394–95, 72 L.Ed.2d 786 (1981); *see generally City of New York v. United States Dep't of Commerce,* 34 F.3d 1114, 1128 (2d Cir.1994) (describing different degrees of scrutiny utilized by Supreme Court). Further, because certain classifications give rise to recurring constitutional difficulties even though no suspect class or fundamental right is involved, the Supreme Court has developed an intermediate level of scrutiny through which courts review the classification to determine whether it is "substantially related to furthering an important governmental purpose." *See Craig v. Boren,* 429 U.S. 190, 97 S.Ct. 451, 50 L.Ed.2d 397 (1976) (gender classifications); *Lalli v. Lalli,* 439 U.S. 259, 99 S.Ct. 518, 58 L.Ed.2d 503 (1978) (classifications based on illegitimacy).

■ Several reported decisions cite *Plyler v. Doe* to justify the use of intermediate scrutiny in cases similar to the one at bar. *See Horton v. Marshall Pub. Sch.,* 769 F.2d 1323, 1329–30 (8th Cir.1985) (holding unconstitutional school district policy denying admission to children with no parent or guardian living within district); *Major v. Nederland Indep. Sch. Dist.,* 772 F.Supp. 944, 948–49 (E.D.Tex.1991) (holding unconstitutional school district policy requiring that students reside in the district with a parent or legal guardian in order to be admitted into the public schools); *Nancy M. v. Scanlon,* 666 F.Supp. 723, 727 (E.D.Pa.1987) (declaring unconstitutional statute allowing school district to refuse to educate non-resident, dependent children living in foster homes within the district); *see also Byrd v. Livingston Indep. Sch. Dist.,* 674 F.Supp. 225, 228–29 (E.D.Tex. 1987) (invalidating, without deciding level of scrutiny, statute under which school district refused education to resident child who did not establish residence for primary purpose of attending district schools). In *Plyler,* the Court invalidated a Texas statute which denied a free public education to the children of illegal immigrants living in Texas. 457 U.S. at 230, 102 S.Ct. at 2401–02. The Court acknowledged that the children of illegal aliens are not a suspect class and that public education is not a fundamental right guaranteed by the Constitution. *Plyler,* 457 U.S. at 221, 102 S.Ct. at 2396–97. Nevertheless, the Court held that an intermediate level of review was appropriate because the statute imposed "[a] lifetime of hardship on a discrete class of children not accountable for their disabling status." *Id.* 457 U.S. at 223, 102 S.Ct. at 2398.

Notwithstanding the above-cited cases, this court disagrees with plaintiffs' suggestion that *Plyler* justifies the application of an intermediate level of scrutiny to the facts of this case. The five-Justice *Plyler* majority, in deciding to apply intermediate level scrutiny to the Texas statute at issue, relied on the combination of a traditionally disadvantaged group (aliens) and an unusually important interest (education). In doing so, the Court avoided the need to decide whether either of these interests by itself justifies intermediate scrutiny. The Court later expressly limited *Plyler* to the "unique circumstances" that

provoked its "unique confluence of theories and rationales." *Kadrmas v. Dickinson Pub. Sch.,* 487 U.S. 450, 459, 108 S.Ct. 2481, 2488, 101 L.Ed.2d 399 (1988) (quoting *Plyler,* 457 U.S. at 239, 243, 102 S.Ct. at 2406, 2408); *see also Philadelphia Police & Fire Ass'n v. City of Philadelphia,* 874 F.2d 156, 165 (3d Cir. 1989) (rejecting ruling of district court that *Plyler* justifies heightened scrutiny for cases involving denial of access to education).

The facts of the instant case bear some resemblance to those of *Plyler.* This case involves a similar "confluence of factors", in that the residency requirement threatens access to an unusually important interest (education) by a member of a disadvantaged group (the mentally retarded). However, in *City of Cleburne v. Cleburne Living Ctr.,* 473 U.S. 432, 442, 105 S.Ct. 3249, 3255–56, 87 L.Ed.2d 313 (1985), the Court refused to treat mental retardation as a quasi-suspect classification justifying intermediate scrutiny. Further, *Plyler* reaffirmed the Court's holding in *San Antonio Indep. School Dist. v. Rodriguez,* 411 U.S. 1, 35, 93 S.Ct. 1278, 1297–98, 36 L.Ed.2d 16 (1973), that burdens on education do not implicate a fundamental right.[11] *Plyler,* 457 U.S. at 221, 102 S.Ct. at 2396–97. Clearly, then, neither interest at stake in this case alone justifies the application of heightened scrutiny. Instead, because the Supreme Court has expressly disavowed the use of *Plyler*'s "confluence of factors" approach to justify heightened scrutiny in future cases, the court must apply rational basis review to the classifications created by New York Education Law § 3202(4)(b). Therefore, the statute at issue in this case violates the Equal Protection Clause only if it is not rationally related to a legitimate government interest.

### 2. Rational Basis Analysis

■ Under the rational basis test the relevant inquiry is whether "*any* reasonably

conceivable state of facts ... could provide a rational basis for the classification." *F.C.C. v. Beach Communications, Inc.,* —— U.S. ——, ——, 113 S.Ct. 2096, 2101, 124 L.Ed.2d 211 (1993) (emphasis added). Where rational basis is the standard of review, a statute will not be stricken merely because it does not in fact achieve its intended result. Instead, the statute survives if the legislature "*could rationally have decided*" that it would fulfill its purpose. *Minnesota v. Clover Leaf Creamery Co.,* 449 U.S. 456, 466, 101 S.Ct. 715, 725, 66 L.Ed.2d 659, *reh'g denied,* 450 U.S. 1027, 101 S.Ct. 1735, 68 L.Ed.2d 222 (1981) (emphasis in original). Thus a statute may satisfy the rational basis test even if in practice it results in some inequality. *Dandridge v. Williams,* 397 U.S. 471, 485, 90 S.Ct. 1153, 1161–62, 25 L.Ed.2d 491, *reh'g denied,* 398 U.S. 914, 90 S.Ct. 1684, 26 L.Ed.2d 80 (1970).

Under New York's Education Law children who, like Dell, live in free family homes or family homes at board are deemed residents of the school district in which the home is located only "when such family homes shall be the actual and only residence of such children." N.Y.Educ.Law § 3202(4)(b). The decision of the New York Court of Appeals in *Catlin v. Sobol,* 77 N.Y.2d at 558–62, 571 N.E.2d at 664, 569 N.Y.S.2d at 356, established the definitive meaning for "actual and only residence" as used in New York Education Law § 3202(4)(b). *Travelers Ins. Co. v. 633 Third Assocs.,* 14 F.3d 114, 119 (2d Cir.1994). Under that interpretation,

> a school district is bound to furnish tuition-free education only for children whose parents or legal guardians reside within the district; that where the parents or guardians reside outside of the district the child presumably resides outside the district also and is not entitled to free education; and that this presumption may be overcome by showing that the parents or guardians have given up parental control and that the child's permanent domicile,

---

11. Despite its view that education is not a fundamental right, the Supreme Court has often noted the extraordinary nature of the individual's interest in education, *see, e.g., Plyler,* 457 U.S. at 234, 236, 102 S.Ct. at 2403–04, 2404–05 (Blackmun, J., concurring); *Vlandis v. Kline,* 412 U.S. 441, 459, 93 S.Ct. 2230, 2240, 37 L.Ed.2d 63 (1973) (White, J., concurring in judgment), in that edu-

cation "provides the basic tools by which individuals might lead economically productive lives to the benefit of us all," *Plyler,* 457 U.S. at 221, 102 S.Ct. at 2397, and is thus "the very foundation of good citizenship." *Brown v. Board of Educ.,* 347 U.S. 483, 493, 74 S.Ct. 686, 691, 98 L.Ed. 873 (1954).

i.e., the child's "actual and only residence"—is within the district. *Id.* 77 N.Y.2d at 559–60, 571 N.E.2d at 665, 569 N.Y.S.2d at 357 (citations omitted). The district containing the family home at board is obliged to fund the child's education only in "cases where the presumption [of residency with the biological parents] is overcome and the child has established a permanent domicile in the home of the family providing the care." *Id.* at 560, 571 N.E.2d at 665, 569 N.Y.S.2d at 357.

As interpreted by New York's highest court, New York Education Law § 3202(4)(b) creates two classes of residents for purposes of receiving a free public education. In addition to the class of residents who are afforded such an education, there is a second class of resident children who are denied a free education because their biological parents reside in a different state and neither forswear their legal control over or financial responsibility for their children.[12] These children are denied a free education regardless of whether they meet all the traditional criteria for residence within the state. At issue in this case is whether the residence requirement, as applied, is rationally related to a legitimate government purpose.

Plaintiffs' interests are readily identifiable. Dell Catlin does not reside in Edmeston for the primary purpose of attending school there. By all accounts, he *lives* in Edmeston. The Condes' home is the foundation of his social and civil life. Because plaintiffs can not afford to pay for Dell's education out-of-pocket, the state's classification of Dell as a non-resident leaves Dell's biological parents with three equally distasteful options. First, they could uproot Dell from his home in Edmeston and bring him to Massachusetts to ensure that he receives a free education. Given Dell's handicapping condition, such a move presumably would have serious emotional and developmental consequences.

Second, they could opt to "surrender parental control" over Dell. *Id.* at 559, 571 N.E.2d at 664, 569 N.Y.S.2d at 356. As interpreted by the Court of Appeals, this would require the Catlins to foreswear their legal authority over Dell, and cease both their financial support of him and their occasional meetings with the committee of the handicapped to plan his educational program. *See id.* at 562, 571 N.E.2d at 666, 569 N.Y.S.2d at 358. This option essentially requires Dell's parents to abandon their conscientious efforts to ensure their son's well-being. Further, abandonment by the Catlins would have the perverse effect of virtually guaranteeing that Dell becomes a ward of the state. Finally, the Catlins could choose to simply remove Dell from school. This result, of course, would also have a profound effect on Dell's educational and personal development. As stated by the Supreme Court, "[i]t is difficult to understand precisely what the State hopes to achieve by promoting the creation and perpetuation of a subclass of illiterates within [its] boundaries." *Plyler,* 457 U.S. at 230, 102 S.Ct. at 2401.

Turning to an examination of the state's interest, the overarching aim of a residency requirement is to ensure that services provided for residents are enjoyed only by residents. This clearly is a legitimate state interest, *Martinez v. Bynum,* 461 U.S. 321, 328, 103 S.Ct. 1838, 1842, 75 L.Ed.2d 879 (1983)[13] and the presumption that children reside with their biological parents is rationally related to the achievement of that interest. Further, while it is true that a concern for the preservation of resources standing alone can not justify the classification used in allocating those resources, here "the legislature chose this home district financing scheme in order to avoid undue financial burdens on school districts containing family homes." State Defendant's Brief, Doc. 33, at 14 (citing *Jeter v. Ellenville Cent. Sch. Dist.,*

---

12. Under New York's scheme, the school district in which the parents reside is financially responsible for the education of children living in out-of-district family homes at board, so long as the parents either exercise control over or financially support the child. Thus the child is not denied a free public education unless the parents live out-of-state.

13. "State[s] can establish such reasonable criteria for in-state status as to make virtually certain that [those] who are not in fact, bona fide residents of the State, but who have come there solely [to receive the benefits afforded residents], cannot take advantage of the [benefits]." *Vlandis v. Kline,* 412 U.S. 441, 453–54, 93 S.Ct. 2230, 2237, 37 L.Ed.2d 63 (1973).

41 N.Y.2d 283, 285, 360 N.E.2d 1086, 392 N.Y.S.2d 403, 404 (1971)); *Plyler,* 457 U.S. at 227, 102 S.Ct. at 2400 (citations to legislative history omitted). Defendants assert that relieving school districts of the extra financial burden of paying the tuition of non-resident students allows districts to retain local control over the quality of the educational services they provide by maintaining a set expenditure level per pupil. Local autonomy over schools is a legitimate state interest, *see Martinez,* 461 U.S. at 329, 103 S.Ct. at 1843 ("No single tradition in public education is more deeply rooted than local control over the operation of schools...." (citations and quotations omitted)), and the legislature certainly could believe that the residency presumption is rationally related to its achievement.

If a rational basis equal protection analysis involved a mere weighing of equities, plaintiffs' interests certainly would prevail in this case. Nonetheless, although in this case the presumption produces an extremely unfair and unwise result, the state "could rationally have decided that it would fulfill its purpose." *Clover Leaf Creamery Co.,* 449 U.S. at 466, 101 S.Ct. at 725. Therefore, because the residency requirement is rationally related to a legitimate government interest, New York Education Law § 3202(4)(b) does not violate the Equal Protection Clause.

*D. Due Process Claim*

■ The court next considers plaintiffs' claim that the Commissioner's application of New York Education Law § 3202(4)(b) violates the Due Process Clause of the Fourteenth Amendment to the United States Constitution[14] because it creates an "irrebuttable presumption" of non-residence for minors who live apart from their biological parents and whose parents either exercise control over them or extend them financial assistance.

The doctrine against irrebuttable presumptions was created by the Supreme Court in the 1970s. *See Rivera v. Reading Housing Auth.,* 819 F.Supp. 1323, 1335 (E.D.Pa.),

*aff'd,* 8 F.3d 961 (3d Cir.1993) (describing the line of Supreme Court cases addressing irrebuttable presumptions). Under that doctrine the Supreme Court struck down statutes creating "impermissible irrebuttable presumptions," which it defined as those presumptions which, although not universally true, can not be rebutted with competent evidence. *Turner v. Dep't of Employment Security,* 423 U.S. 44, 96 S.Ct. 249, 46 L.Ed.2d 181 (1975) (striking statute creating, for purposes of eligibility for unemployment compensation, irrebuttable presumption that pregnant women are unable to work for the period extending from twelve weeks before the expected date of childbirth through six weeks after childbirth); *Cleveland Bd. of Educ. v. La-Fleur,* 414 U.S. 632, 94 S.Ct. 791, 39 L.Ed.2d 52 (1974) (striking school board rule embodying presumption that pregnant teachers are unable to work for five months prior to expected date of childbirth); *Vlandis v. Kline,* 412 U.S. 441, 93 S.Ct. 2230, 37 L.Ed.2d 63 (1973) (striking as violative of Due Process Clause an irrebuttable presumption of non-residence of out-of-state students entering state university); *Stanley v. Illinois,* 405 U.S. 645, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972) (striking statute creating irrebuttable presumption that unwed fathers are not fit parents); *United States Dep't of Agric. v. Murry,* 413 U.S. 508, 93 S.Ct. 2832, 37 L.Ed.2d 767 (1973) (striking section of Food Stamp Act of 1964 creating irrebuttable presumption that a child is not indigent if declared a dependent on parent's tax return for the prior year).

■ The leading case applying the doctrine against irrebuttable presumptions is *Vlandis v. Kline,* 412 U.S. 441, 93 S.Ct. 2230, 37 L.Ed.2d 63 (1973). In that case, the Supreme Court held unconstitutional a Connecticut statute which employed an irrebuttable presumption that a student who had a legal address outside the state at the time he or she applied for admission to a state university was not a resident for purposes of receiving in-state tuition rates. *Id.,* 412 U.S. at 452, 93 S.Ct. at 2236. This presumption

---

**14.** "[N]or shall any State deprive any person of life, liberty, or property, without due process of

law." U.S. CONST. amend. XIV, § 1.

remained with the student for as long as he or she was a student. *Id.* The Supreme Court first determined that it was not universally true that students who applied from outside the state were not, and could not become, bona fide residents of Connecticut. *Id.* Next, the Court noted that the state had reasonable alternative means for determining a student's actual residence, thereby "mak[ing] virtually certain that students who are not, in fact, bona fide residents of the State, but who have come there solely for educational purposes, cannot take advantage of the in-state rates." *Id.*, 412 U.S. at 453–54, 93 S.Ct. at 2237. One reasonable standard that would pass constitutional muster, the Court noted, was a scheme through which " 'each individual case [is] decided on its own particular facts. In reviewing a claim, relevant criteria include year-round residence, voter registration, place of filing tax returns, property ownership, driver's license, car registration, marital status, vacation employment, etc.' " *Id.*, 412 U.S. at 454, 93 S.Ct. at 2237 (quoting with approval standard adopted by Connecticut, after the invalidation of its original standard by the district court, for reviewing residential status of students). The majority then held that

> since Connecticut purports to be concerned with residency in allocating the rates for tuition and fees at its university system, it is forbidden by the Due Process Clause to deny an individual the resident rates on the basis of a permanent and irrebuttable presumption of non-residence, when that presumption is not necessarily or universally true in fact, and when the State has a reasonable alternative means of making the crucial determination. Rather, standards of due process require that the State allow such an individual the opportunity to present evidence showing that he is a bona fide resident entitled to in-state rates.

412 U.S. at 452, 93 S.Ct. at 2236.

Since its inception in the 1970s, the doctrine against irrebuttable presumptions has been heavily criticized by both legal scholars and members of the Court. *See, e.g., LaFleur*, 414 U.S. at 652, 94 S.Ct. at 802 (Powell, J. concurring), and at 660 (Rehnquist, J. dissenting); *Vlandis*, 412 U.S. at 462, 93

S.Ct. at 2241–42 (Burger, C.J. dissenting); John N. Phillips, Note, "Irrebuttable Presumptions: An Illusory Analysis," 27 STAN. L.REV. 449 (1975); Note, "The Irrebuttable Presumption Doctrine in the Supreme Court," 87 HARV.L.REV. 1534 (1974). In general, the criticism centers on the claim that the doctrine is "equal protection in disguise," and an "assault on the fundamental prerogative of the legislature to legislate by classification." *B.G.M. Enterprises v. Harris*, 482 F.Supp. 1073, 1081 (D.Mont.1980). In the words of then-Justice Rehnquist, the rationale of *Vlandis* is "in the last analysis nothing less than an attack on the very notion of lawmaking itself," because the doctrine against irrebuttable presumptions limits many legitimate efforts of legislatures in drawing logical distinctions. *LaFleur*, 414 U.S. at 660, 94 S.Ct. at 806.

In the wake of these criticisms, the Supreme Court began a limited retreat from the doctrine against irrebuttable presumptions in the mid-to-late 1970s. In *Weinberger v. Salfi*, 422 U.S. 749, 95 S.Ct. 2457, 45 L.Ed.2d 522 (1975), Justice Rehnquist wrote the majority opinion, in which the court circumscribed the applicability of *Vlandis* to future cases. *Salfi* upheld a Social Security rule denying death benefits to a widow or step-child based on the duration of their relationship to the deceased. The basis of the rule was a presumption that a marriage was fraudulent where it had not lasted for more than nine months prior to the decedent's demise. According to the majority, the extension of *Vlandis* to such a statute "would turn the doctrine [against irrebuttable presumptions] ... into a virtual engine of destruction for countless legislative judgments which have heretofore been thought wholly consistent with the Fifth and Fourteenth Amendments to the Constitution." *Salfi*, 422 U.S. at 772, 95 S.Ct. at 2470.

In *Elkins v. Moreno*, 435 U.S. 647, 98 S.Ct. 1338, 55 L.Ed.2d 614 (1978), the Court clarified the limitations *Salfi* placed on *Vlandis*. *Elkins* addressed a Maryland statute which applied an irrebuttable presumption of non-residence, for purposes of tuition within the state university system, to those applicants who held or whose parents held a G–4 visa.

A G–4 visa is a nonimmigrant visa granted to officers and employees of international organizations and immediate members of their families. Because a holder of such a visa is neither a United States citizen nor an alien admitted for permanent residence, the University determined that a holder of a G–4 visa could not form the intent necessary to establish domicile. *Id.,* 435 U.S. at 654–55, 98 S.Ct. at 1343–44.

The *Elkins* Court specifically rejected the notion that *Salfi* overruled *Vlandis* in the context of residence requirements:

> Because petitioner makes domicile the 'paramount' policy consideration and because respondents' contention is that they can be domiciled in Maryland and are conclusively presumed to be unable to do so, this case is squarely within *Vlandis* as limited by *Salfi* to those situations in which a state "purport[s] to be concerned with [domicile, but] at the same time den[ies] to one seeking to meet its test of [domicile] the opportunity to show factors clearly bearing on that issue."

*Elkins,* 435 U.S. at 660, 98 S.Ct. at 1346 (quoting *Salfi,* 422 U.S. at 771, 95 S.Ct. at 2470).[15] While the Court did not proceed to apply the *Vlandis* test to the Maryland law,[16] clearly the Court considered *Vlandis* to be valid precedent. *See Sakol v. C.I.R.,* 574 F.2d 694, 697 (2d Cir.), *cert. denied,* 439 U.S. 859, 99 S.Ct. 177, 58 L.Ed.2d 168 (1978) (noting in the wake of *Salfi* that the "Court has *narrowed* the broad scope of the [doctrine against] irrebuttable presumption[s]" (emphasis added)).

Subsequent to *Elkins,* at least two lower courts have applied *Vlandis* in cases similar to the one at bar. In *Horton v. Marshall Pub. Schs.,* 769 F.2d 1323, 1332 (8th Cir. 1985), the Eighth Circuit held unconstitutional an Arkansas residency statute containing a presumption that a child resides with his parents or legal guardians for purposes of receiving a free public education, regardless of the child's presence in a different location. Because of economic and domestic problems, plaintiffs in *Horton* were living in the Marshall School District with relatives who were not their biological parents or legal guardians. *Id.* at 1325. The court applied *Vlandis,* stating that "it is not 'universally true' that children who do not have a parent or legal guardian living in the Marshall school district are not domiciled in the district (i.e. residing in the district with a present intent to remain)." *Id.* at 1332. Because the state had reasonable alternative means of determining which students were actually residents,[17] the *Horton* court struck the law as creating an impermissible irrebuttable presumption.

In *Steven M. v. Gilhool,* 700 F.Supp. 261, 263 (E.D.Pa.1988), a district court struck a state statute which created an irrebuttable presumption that a child resides with his biological parents for purposes of charging

---

**15.** The *Elkins* Court was addressing the issue of domicile rather than the related concept of residence, which was the focus of *Vlandis.* The bracketed portion of the quotation replaces "residency" with "domicile." *See Salfi,* 422 U.S. at 771, 95 S.Ct. at 2469–70; *Elkins,* 435 U.S. at 660, 98 S.Ct. at 1346.

**16.** In considering the first prong of the *Vlandis* test, the court found it was unable to determine whether the presumption that a G–4 visa-holder was a non-domiciliary was universally true, because such a determination required a novel interpretation of Maryland law. The Court certified a question to the Maryland Court of Appeals, which responded that no Maryland law precluded a G–4 holder from establishing domicile. Nonetheless, the Court did not immediately reconsider the case, as it believed the University had "fundamentally altered the posture of the case" in issuing a resolution clarifying the purpose of its policy. *Toll v. Moreno,* 441 U.S. 458,

461, 99 S.Ct. 2044, 2045–46, 60 L.Ed.2d 354 (1979) (per curiam). The Court vacated the judgment of the Court of Appeals and remanded to the district court, which issued a ruling applying *Vlandis* to the policy for the period prior to the clarifying resolution, and did not apply *Vlandis* to the period following the resolution. *Moreno v. Toll,* 480 F.Supp. 1116, 1122–25 (D.Md. 1979). The Court of Appeals affirmed. *Moreno v. University of Maryland,* 645 F.2d 217, 220 (4th Cir.1981) (per curiam). The Supreme Court affirmed the judgment of the Court of Appeals without reaching the issue of Due Process. *Toll v. Moreno,* 458 U.S. 1, 9–10, 102 S.Ct. 2977, 2981–82, 73 L.Ed.2d 563 (1982).

**17.** The *Horton* court did not expressly address any potential alternatives, noting only that "as in *Vlandis,* reasonable alternative means of determining the child's domicile exist." 769 F.2d at 1332.

tuition at state schools. A class of children sued, seeking to invalidate the law on Due Process grounds. In assessing the constitutionality of the Pennsylvania statute, the *Steven M.* court started with *Vlandis,* calling it "squarely on point." *Id.* 700 F.Supp. at 263. Like the Connecticut law struck in *Vlandis,* the Pennsylvania statute purported to be concerned with the residence of the student in deciding whether to admit him tuition-free. *Id.* 700 F.Supp. at 264. Further, like Connecticut's statute, the Pennsylvania law disregarded factors "clearly bearing on the issue of the student's residence," thus creating an irrebuttable presumption that the child's former home, with his parents, remained his residence. *Id.* Applying *Vlandis* to the facts before it, the *Steven M.* court found that the presumption in question was not universally true and that reasonable alternatives existed for determining residency. Therefore, the court concluded, the statute violated the Due Process Clause by creating an unconstitutional irrebuttable presumption. *Id.,* 700 F.Supp. at 265 ("The due process clause simply forbids Pennsylvania from presuming, without opportunity for rebuttal, that a school-age child invariably resides wherever his parents reside.").

Like the *Horton* and *Steven M.* courts, this court holds that *Vlandis,* although limited by *Salfi,* is valid precedent, and has a direct bearing on the instant case. Under *Vlandis,* an "irreversible and irrebuttable statutory presumption" violates the Constitution if: (1) the presumption involves residency or domicile; (2) the presumption is "not necessarily or universally true"; and (3) the "State has reasonable alternative means of making the crucial determination." *See Vlandis,* 412 U.S. at 452, 93 S.Ct. at 2236; *Toll,* 458 U.S. at 6 n. 7, 102 S.Ct. at 2980; *Elkins,* 435 U.S. at 660, 98 S.Ct. at 1346; *Salfi,* 422 U.S. at 749, 95 S.Ct. at 2458–59; *Horton,* 769 F.2d at 1332; *Steven M.,* 700 F.Supp. at 264. Turning to the circumstances underlying the case at bar, the court addresses *seriatim* each of the factors in the irrebuttable presumption analysis.

First, like the statutes at issue in *Vlandis* and *Elkins,* New York Education Law § 3202(1) purports to be concerned primarily with the residence of children attending public schools. *See* N.Y.Educ.Law § 3202(1) (a child is "entitled to attend the public schools maintained in the district *in which such person resides* without the payment of tuition" (emphasis added)). Thus it is natural that in addressing children who live in family homes at board the statute concerns itself with determining whether the family home at board is the child's "actual and only residence." N.Y.Educ.Law § 3202(4)(b).

Turning to the second factor, it is not universally true that if a child's out-of-district parents lend him financial support or retain control over him in any way, the child resides with the parents. Residence is a term "well known in the law, if not precisely defined." *Steven M.,* 700 F.Supp. at 264. Establishing residence necessitates meeting essentially the same requirements as for domicile. *Martinez,* 461 U.S. at 331–32, 103 S.Ct. at 1844–45. That is, a person must be present in the state with the intention to remain indefinitely. *Id.; Vlandis,* 412 U.S. at 448, 93 S.Ct. at 2234; *see also Kartiganer v. Koenig,* 194 A.D.2d 879, 881, 599 N.Y.S.2d 312, 314 (3d Dep't 1993) (describing intent relative to domicile as "whether the place of habitation is the permanent home of a person, with the range of sentiment, feeling and permanent association with it." (quotations and citations omitted)). In establishing the residence of a child, the intention of the parent or guardian on behalf of the child is relevant.[18] *Martinez,* 461 U.S. at 332, 103 S.Ct. at 1844–45.

Under New York Education Law § 3202(4)(b), as interpreted by the New York Court of Appeals, in order for a child living in a family home at board to establish residency for purposes of education, he must demonstrate that his parents neither exercise control over nor maintain financial responsi-

---

**18.** In *Martinez,* the Court noted that "a school district generally would be justified in requiring school-age children *or their parents* to satisfy the traditional, basic residence criteria ... before it treated them as residents." 461 U.S. at 332, 103 S.Ct. at 1844–45 (emphasis added). While the quoted passage is ambiguous, the Court stated in a footnote that "of course, it is the intention of the parent or guardian *on behalf of the child* that is relevant." *Id.* n. 14 (emphasis added).

bility for him. *See* Commissioner's Decision, Exh. A attached to Doc. 22, at 2; *Catlin v. Sobol,* 77 N.Y.2d at 561–63, 571 N.E.2d at 666, 569 N.Y.S.2d at 358. Under the state's scheme these two factors—control and financial assistance—are the sole criteria with which children in family homes at board may rebut the presumption that they live with their biological parents.

This limited, formulaic approach to what should be a fact-laden determination ignores many potentially relevant considerations. As perceived by the *Steven M.* court, those considerations include "where [the child] lives, why he came to live there, whether he intends to remain there indefinitely and ... whether his parents intend for him to remain there indefinitely." 700 F.Supp. at 264. In addition, another relevant factor is the disabling status of a child, which may be germane to a full understanding of the intent of the parents.

Indeed, the unique set of facts of this case demonstrates that the challenged presumption does not reflect a necessary or universal truth. In the context of a child born with a severe handicapping condition, the intent of both the parents and the child—critical factors in the determination of the child's "actual and only residence"—can be discerned only after considering the myriad factors underlying the placement of the child in a family home at board. In this case, for example, the Catlins' control over and financial support of Dell may be less an indication of their intent regarding Dell's residence as they are a reflection of the Catlins' profound respect for their moral obligations as Dell's biological parents.[19] Because it is not disputed that both Dell Catlin and his parents have always intended that the Condes' home be Dell's actual and only residence, the presumption employed by New York Education Law § 3202(4)(b) acts in this instance to deprive a seemingly bona fide resident of the benefits afforded to other citizens.

Finally, turning to the third factor in the *Vlandis* analysis, the state has reasonable alternative means for determining residency for purposes of New York Education Law § 3202(4)(b). This was recognized in a strong dissent to the majority decision of the New York Court of Appeals. Reciting the overwhelming factual evidence that Edmeston is the only home Dell Catlin has ever known, Judge Bellacosa, joined by Judge Titone, sharply criticized the majority's reliance on a "legal axiom" to impose upon Dell the residence of his biological parents. *Catlin,* 77 N.Y.2d at 563, 571 N.E.2d at 667, 569 N.Y.S.2d at 359 (Bellacosa, J., dissenting). In the following passage Judge Bellacosa tacitly acknowledges the constitutional infirmity this court perceives in defendants' application of § 3202(4)(b) to Dell's residency status:

> Determining whether a family home at board is a child's "actual and only" residence is fact-laden and necessarily requires case-by-case scrutiny. Facile application of the cold formalism that children are deemed to reside with their [biological] parents in genuine circumstances such as presented here is plainly wrong, because presumptions and legal fictions, while they may simplify cases, are not proper substitutes for individualized analysis and determination.

*Id.* at 566, 571 N.E.2d at 669, 569 N.Y.S.2d at 361.

As suggested by Judge Bellacosa, a case-by-case determination is a valid alternative to the "facile application of the cold formalism" of presuming that Dell resides with his biological parents in a district into which he has never and has no plans to ever set foot. Case-by-case scrutiny would allow the school district to make a reasoned inquiry, considering any factor bearing on the issue of resi-

19. In fact, the evidence in this case that Dell Catlin is a resident of Edmeston School District is more compelling than the evidence favoring the plaintiffs in *Steven M.* In that case, children were placed in "children's institutions," which were defined as "any orphan asylum, home for the friendless, children's home, or other institution for the care or training of orphans or other children." *Steven M.,* 700 F.Supp. at 262 (quotations and citations omitted). Although at least some of the members of the plaintiff class lived in such institutions for long periods of time, apparently none were placed there on a virtually permanent basis, as Dell Catlin was placed with the Condes. *Id.*

dency. Consideration of *all* factors relevant to determining of a child's residency clearly is a valid alternative to slavish adherence to the presumption that a child resides with his biological parents. *See Vlandis,* 412 U.S. at °453–54, 93 S.Ct. at 2237 (suggesting that the state could establish "some reasonable criteria for in-state status," such as an individualized determination); *Steven M.,* 700 F.Supp. at 265 (suggesting that "an individualized factual determination of residence" is a valid alternative).

In sum, the Due Process Clause forbids New York from presuming, without opportunity for rebuttal, that a school-age child who lives at a family home at board resides with his biological parents, simply on the basis that the parents either maintain legal control over or extend financial responsibility to the child. Considering the factors outlined in *Vlandis* and its progeny, New York Education Law § 3202(4)(b), as applied, creates an impermissible, irrebuttable presumption which denies a child living in a family home at board a meaningful opportunity to show factors clearly bearing on the issue of residency. Therefore, because § 3202(4)(b), as applied, violates the Due Process Clause of the Fourteenth Amendment to the United States Constitution,[20] plaintiffs' motion for summary judgment is granted.[21]

## IV. CONCLUSION

The court concludes that New York Education Law § 3202(4)(b), as interpreted and applied by defendants in this case, violates the Due Process Clause of the Fourteenth Amendment to the United States Constitution because the statute contains an irrebuttable presumption concerning the residency of plaintiff Dell Catlin. In light of this ruling, plaintiffs' motion for summary judgment is granted. The cross-motion for summary judgment dismissing the complaint brought by defendants Holdorf and Edmeston Cen-

tral School District, and the cross-motion for summary judgment brought by defendant Sobol, are denied. The clerk of the court is instructed to enter judgment in favor of plaintiffs in accordance with these rulings. Plaintiffs have 30 days from the filing of this decision in which to submit an application for attorney's fees and costs.

It is So Ordered.

---

**20.** It is important to note that the court's ruling does not involve a determination of whether Dell Catlin is in fact a resident of Edmeston County. Rather, the court holds merely that the process through which the Edmeston School Board determined his residency is constitutionally infirm. Further, although the court holds that for purposes of N.Y.Educ.Law § 3202(4)(b) the state must consider all factors relevant to a child's

actual and only residence, the court leaves the mechanics of determining residency to the state.

**21.** Because the court finds that New York Education Law § 3202(4)(b), as interpreted, violates the Due Process Clause, it need not reach plaintiffs' claim under the Privileges and Immunities Clause.